[L. A. No. 3133.    In Bank.—March 20, 1913.]

WILLIAM F. COPELAND et al., Appellants, v. THE
    FAIRVIEW LAND AND WATER COMPANY and
    THE LAKE HEMET WATER COMPANY, Respond-
    ents.

WATER—WHEN REAL OR PERSONAL PROPERTY—WATER STORED IN RESER-
    VOIR OF IRRIGATION COMPANY IS REALTY—RIGHT TO USE MAY BE-
    COME APPURTENANT TO LAND.—Water, in its natural state, is part
    of the land. Like any other part thereof, it may become personal
    property by being severed from the realty, but not until then.
    When it is sold for domestic use and delivered by means of pipes
    to the premises in the usual manner, the pipes themselves are fix-
    tures and part of the realty, and this severance takes place when
    the water is taken from the pipes by the consumer. In the case of.
    water for irrigation, delivered in ditches or pipes, the severance
    does not take place at all. The water, by that use of it, permeates
    the soil and remains a part of the realty. The water, therefore,
    of an irrigation company, stored in its reservoir, is real property,
    the right to the use of which may become appurtenant to land.

ID.—CONSTRUCTION OF CONTRACT BETWEEN WATER COMPANIES.—It is
    held, that a certain contract, referred to in the opinion, between
    the two water companies defendants, did not vest in one of them
    any interest whatever in the water belonging to the other, and that
    the plaintiffs had not, by mesne conveyances, obtained any interest
    in the water of the latter which can now be enforced.

ID.—AGREEMENT FOR SEGREGATION OF WATERS OF STREAM—EXECUTORY
    AGREEMENT TO SELL WATER—RIGHT OF PROPERTY IN WATER NOT
    TRANSFERRED.—Where two water companies, each having or claim-
    ing interest in the waters of a particular stream, enter into an agree-
    ment the effect of which was to segregate and define the parts of
    the stream which should thereafter be deemed to belong to each
    company, respectively, a provision of such agreement, whereby one
    of the companies merely undertakes, in the event that the water so
    segregated to the other shall at any time be insufficient to supply
    and irrigate its lands, to furnish water to such other upon the same
    terms and price that it furnishes water to third persons, and to
    deliver such water into the pipes of the other on their lands at such
    points on the line of its pipes to which the other may lay their pipes,
    does not operate to transfer to the promisee any property right or
    interest in the supply of the promisor. At most, it is a mere exec-
    utory agreement for sales of water, to be effective at the option of
    the promisee.

ID.—UNCERTAINTY OF AGREEMENT — INCAPABILITY OF ENFORCEMENT AGAINST SPECIFIC PROPERTY.—Such agreement, considered as one to sell an interest in property, lacks the essential element of certainty as to the property which is to be delivered. It does not state the quantity of water to be furnished, nor give any means of determining that quantity. The precise act to be done in its performance is not clearly ascertainable. It is therefore incapable of enforcement against any specific property.

ID.—RIGHT TO SUPPLY OF WATER LOST BY LACHES—FAILURE TO DEMAND WATER UNDER CONTRACT.—Where subsequent to the making of such contract the water so segregated to the promisee was always insufficient to irrigate its lands, and for a continuous period of more than twenty-one years no water was ever demanded to be furnished under the contract, and its validity as a conveyance or agreement to convey an interest in the waters of the promisor was never at any time recognized by that company, all right of action to enforce the contract in equity has become barred by laches.

ID.—IRRIGATION COMPANY—WATER DEDICATED TO PUBLIC USE—NECESSARY QUALIFICATIONS OF APPLICANTS FOR WATER.—An irrigation company, whose water is devoted to public use, cannot be compelled to furnish water to applicants therefor in the absence of evidence to show that their lands are within the area to which such water has been dedicated, or that they are entitled to water from its system, or that it has any surplus to apply to lands not within the original dedication.

ID.—RIPARIAN RIGHT IN ENTIRE TRACT—SALE OF PARCELS OF TRACT WITH PROPORTION OF WATER-RIGHT—PROXIMITY OF PARCEL TO STREAM.—An owner of a tract of land abutting upon a natural stream, to every part of which the riparian right extended, upon dividing and selling the tract in several parcels, may apportion and preserve to each parcel sold a portion of the water-right originally belonging to the entire tract, regardless of the proximity of such parcels to the stream. Such an apportionment is good as between the owners of the several parcels; how far it is good against owners of other riparian lands upon the same stream, not part of such tract, is not determined.

ID.—TRANSFER OF WATER-RIGHT TO CORPORATION AS TRUSTEE OF OWNER OF TRACT—ISSUANCE OF STOCK CERTIFICATES ENTITLING HOLDER TO PROPORTION OF WATER—TRANSFER OF STOCK TO PURCHASERS OF LOTS.—This result might be, and in the present instance was, accomplished through the device of a transfer, by the owner of the tract, without consideration, of the entire riparian right to a corporation, acting as a naked trustee for the benefit of the owner, the immediate issuance to the latter of shares of stock in the corporation, the aggregate of which entitled it to the whole of such water-right, and the subsequent sale and transfer by the owner to each purchaser of a

parcel of the tract of shares of such stock entitling the holder to a proportional part of the water-right.

Id.—Transfer of Water-right by Certificates of Stock.—Where the certificates of stock so issued by the transferee of the water-right declared that the holder thereof was "entitled" to a certain part of the water "belonging to" the corporation, the legal effect was to transfer to the holder the title to that part of the water held by the corporation at the time.

Id.—Purchasers of Lots Became Cotenants of Water-right With Owner of Tract—Owner Trustee for Cotenants in Operation of Water System.—Where such parcels were so sold, with the certificates of stock carrying the water-right, the owner of the tract immediately became a tenant in common of the water-right with the purchasers, each being entitled to his proportional share therein; and if such owner, through its actual control of the operation of the corporation to which the naked legal title to the water-right had been conveyed, was in practical control of the waterworks and the distribution of the water for the benefit of all the owners thereof, it stood in the relation of trustee for the owners of the several parcels of land so conveyed.

Id.—Attempted Transfer to Corporation Having No Legal Existence—Title Does Not Pass.—A contract purporting to transfer property to a fictitious person, or to one who is dead at the time, or to a corporation having no legal existence, passes no title at all. The title to the property attempted to be transferred remains in the transferrer.

Id.—Adverse Possession of Water System by Owner of Tract—Effect on Water-right of Purchasers of Lots.—If the owner of the tract subsequently takes actual adverse possession of the system of waterworks constructed by such corporation, and thereafter holds the same and continues the operation thereof adversely to the corporation, for a sufficient time to acquire its right and title thereto by prescription, such fact would not, of itself, divest the right and title of the purchasers of such parcels to their proportion of the water-right.

Id.—Essentials of Adverse Possession by Owner of Tract Against Cotenants of Water-right—Repudiation of Claim of Cotenants. As the owner of the tract occupied the relation of trustee toward such purchasers, and tenant in common of the water supply with them, in order to make its possession adverse to them and to their right and title to the water so acquired by them, it was necessary for it to distinctly inform them that it repudiated their claim and right to a share of the water, under their water stock, and that it claimed the ownership of all the water adversely to their title.

Id.—Imposition of Charges for Water Distributed.—If such owner claimed the right to impose charges to cover more than the cost of upkeep and a fair charge for the service of administering the

system, it was necessary, under such circumstances, that it should make such claim clearly known to its cotenants, and give them notice that its charges were for other purposes; otherwise, its conduct in taking possession of the works and distributing the water for all concerned would not be adverse to the title of its cotenants and their right to receive a proportion thereof.

ID.—IMPOSITION OF CHARGES DID NOT MAKE POSSESSION ADVERSE.— The mere fact that the owner of the tract, after it took possession of the waterworks, imposed charges for the water similar to those imposed by its predecessors, and based such charges upon the quantity of the water delivered without regard to the proportional share of each cotenant, did not make its possession adverse. The imposition of such charges was not notice to the cotenants that their right or title to their proportional shares of water was disputed or invaded. They would reasonably suppose that the charges were imposed because of the necessity of raising money to defray the expense of repairs and the cost of service.

ID.—COTENANTS RIGHTS NOT LOST BY ADVERSE POSSESSION.—It is held that the finding that the plaintiffs had lost their right to their proportional share of the water of the stream because of the adverse possession of the owner of the tract, is contrary to the evidence.

ID.—PROPER CHARGES AGAINST COTENANTS FOR DELIVERY OF WATER— RETURN ON VALUE OF WATER-RIGHT NOT PERMITTED.—The owner of the tract, in its operation of the waterworks and in the distribution of the water among the cotenants thereof, is entitled to impose charges necessary to pay the cost of service and expense of upkeep, and to include in such charges a sum sufficient to cover the cotenants' proportional shares of the interest on the amount expended by it in renewing and repairing the pipes and conduits of the system, and perhaps to enforce contribution of the principal. It has no right to base its charges upon the theory that it is the owner of the water delivered to the cotenants, and that it is, consequently, entitled to a reasonable return upon the value of that water considered as an investment.

ID.—SALE OF INTEREST IN WATER-RIGHT ACQUIRED BY PRESCRIPTION OR APPROPRIATION—FAILURE OF VENDEE TO USE WATER.—Where one who has diverted water and thereby acquired a water-right, whether by prescription or statutory appropriation, sells an interest in it to another and thereafter continues to divert the water himself for the vendee, the fact that the vendee does not demand or use the water he has bought will not forfeit his right thereto to the vendor who has in the mean time continued the diversion, unless such vendor in some manner informs the vendee that such forfeiture will be claimed because of nonuse, or asserts it against him by some hostile act.

ID.—WATER-RIGHT ORIGINALLY ACQUIRED AS EASEMENT BY ENJOYMENT —TRANSFER BY ORIGINAL ACQUIRER—VENDEE DOES NOT LOSE RIGHT

by Mere Disuse.—If it be assumed that the water-right appurtenant to the tract was an easement or servitude originally acquired by the owner of the tract by enjoyment, it having transferred the right after its acquisition by contract to the purchasers of lots, the right became, as between them and their vendor, a right which they acquired by conveyance, and not by prescription, and the doctrine that an easement acquired by use is lost by mere disuse does not apply to such right.

Id.—Transfer of Riparian Right Did not Change Its Character—Such Right not Lost by Mere Disuse.—The right originally belonging to the tract was a riparian right, and its nature was not changed by its transfer to the holding company, and the simultaneous retransfer thereof to the owner of the tract by virtue of the issuance to it of the entire capital stock, and the subsequent transfer of such stock to purchasers of lots. So long as such purchasers retained the stock accompanying their purchase, the water-right so conveyed to them retained its riparian character, and was not lost by mere disuse, and until the owner of the tract manifested an intention to take and hold adversely to them the water to which their lands were entitled, its title against them by prescription would not begin to run.

APPEAL from a judgment of the Superior Court of Riverside County and from an order refusing a new trial.　F. E. Densmore, Judge.

The facts are stated in the opinion of the court.

P. N. Myers, Wm. F. Copeland, and Purington & Adair, for Appellants.

Collier, Carnahan & Craig, for Respondents.

SHAW, J.—The plaintiffs appeal from the judgment and from an order denying their motion for a new trial.

The object of the plaintiffs' action was to obtain a decree declaring that they were each entitled to receive from The Fairview Land and Water Company sufficient water upon their respective tracts of land for irrigation and domestic use thereon, upon payment of charges sufficient to defray the expenses of keeping up the water system and distributing the water, and to enjoin The Fairview Company from demanding or collecting charges for the delivery of such water in excess of the sum reasonably necessary for the purposes stated, not exceeding ten cents per inch per day of twenty-four

hours. As to The Lake Hemet Water Company, they asked a decree declaring that they were entitled to share in the water of that company whenever the water of The Fairview Company was insufficient to supply and irrigate their said lands.

The court adjudged that the plaintiffs McCunn, Bradshaw, Hart, Elise Beck, Catherine Beck, and Emily Compton, as to certain lands specifically described, had no right to demand or receive water from either defendant. With regard to the other lands described in the complaint, the judgment was that the plaintiffs are each entitled to the continuous use of water for irrigation and domestic purposes upon their respective tracts of land, to be delivered to them by The Fairview Land and Water Company, upon the payment of such legal rates and tolls as shall be charged for furnishing the said water, but that none of the plaintiffs had any right or interest in water belonging to The Lake Hemet Water Company. The right of the plaintiffs, except as above stated, to receive water from the water supply in control of the Fairview Company, on payment of lawfully fixed tolls, was conceded by that company in its answer. Thus, it will be observed, that, except as to the lands first mentioned, the only dispute between the plaintiffs and the defendant, The Fairview Land and Water Company, is whether the charges which the company may impose are limited to the amount necessary to cover the cost of keeping up the waterworks and distributing the water, not to exceed ten cents for each inch per day, or whether the company may charge a greater sum, including reasonable annual interest upon its investment. And the main question on this branch of the case is whether or not the Fairview Company is the owner of the water itself and may consequently include the value of the water supply as part of the investment upon which it is entitled to a reasonable return as part of its charges for delivering water to the plaintiffs.

1. We think the claim of right to receive water from the supply belonging to The Lake Hemet Water Company is not well founded.

We cannot agree with the argument on behalf of that company that as its water supply consists of water stored in a reservoir, such stored water is personal property which can-

not be appurtenant to land, in support of which *Heyneman v. Blake*, 19 Cal. 594, is cited. There is a statement in the opinion in that case that water, when collected in reservoirs and pipes and thus separated from its original source, is personal property. But this declaration cannot be accepted as sound. The question involved in that case was the question whether or not a corporation which stores water, conducts it through the earth in pipes and sells and delivers it by that means to the inhabitants of a city on their premises, is engaged in trade and commerce. Unquestionably it is, but not, as is there erroneously said, because the water becomes personalty when thus stored, but, as is further said, because it is then sold for a price to the inhabitants. Upon delivery for household use, it undoubtedly becomes personal property, being then completely severed from the realty. The question of the character of water as property was fully considered in *Stanislaus etc. Co.* v. *Bachman*, 152 Cal. 725, [15 L. R. A. (N. S.) 359, 93 Pac. 858]. *Heyneman* v. *Blake* was distinguished, and the remark therein, above referred to, was declared not to be the law. Water, in its natural state, whether in streams, lakes or ponds, or in percolation through the soil, is part of the land. Like any other part thereof, it may become personal property by being severed from the realty, but not until then. When it is sold for domestic use and delivered by means of pipes to the premises in the usual manner, the pipes themselves are fixtures and part of the realty, and this severance takes place when the water is taken from the pipes by the consumer. In the case of water for irrigation, delivered in ditches or pipes, the severance does not take place at all. The water, by that use of it, permeates the soil and remains a part of the realty. The water of the Hemet Company, stored in its reservoir, is therefore real property, the right to the use of which may become appurtenant to land.

There are other reasons, however, advanced by that company, which fully support its position. Plaintiff's claim is based wholly on a contract, dated February 12, 1887, between the Fairview Land and Water Company and the Lake Hemet Water Company. The theory of the plaintiffs is that this contract vested in the Fairview Company a right or interest in the waters belonging to the Hemet Company and that by mesne conveyances, which for the present it is not necessary

to state in detail, a proportional share of this right in the
Hemet water became vested in the plaintiffs.   We think the
said contract did not vest in the Fairview Company any in-
terest whatever in the water belonging to the Hemet Com-
pany, and, consequently, that whatever may have been the
effect of the mesne conveyances above mentioned as to other
waters, the plaintiffs obtained no interest in the Hemet water
which can now be enforced.   At the time that agreement was
made the Fairview Company and the Hemet Company each
had or claimed interests in the waters of the San Jacinto
River, and there was some conflict as to their respective
rights.   The main purpose and effect of the agreement was
to segregate and define the parts of the stream which should
thereafter be deemed to belong to each company, respectively,
so that neither should thereafter have any right or claim in
the part therein set apart to the other.   The Hemet Company
therein quitclaimed and released to the Fairview Company
all right, title, or interest in the waters of two tributaries of
the river known as Strawberry Creek and the North Fork
and all of the waters of the South Fork below a certain diver-
sion dam to be constructed therein a short distance above the
junction of the South Fork and Strawberry Creek.   The
Fairview Company, in turn, quitclaimed to the Hemet Com-
pany all right, title, or interest in the waters of the South
Fork above the said diversion dam.   The clause under which
the plaintiffs claim was as follows, the Hemet Company being
the first party and the Fairview Company the second party:

"And said party of the first part hereby agrees to and with
the said party of the second part that if at any time the water
hereinbefore mentioned of said last named party shall be in-
sufficient to supply and irrigate its lands, the said party of
the first part will furnish water to said party of the second
part upon the same terms and price it furnishes water to
other persons by the day or by the run, and will deliver such
water into the pipes of said parties of the second part on their
said lands at such points on the line of its pipe or pipes to
which said parties of the second part may lay their pipes.''

This clause does not operate to transfer to the Fairview
Company any property right or interest in the supply of the
Hemet Company.   At most, it is a mere executory agreement
for sales of water, to be effective at the option of the Fair-

view Company. As an agreement to sell an interest in property, it lacks the essential element of certainty as to the property which is to be delivered. It does not state the quantity of water to be furnished, nor give any means of determining that quantity. The precise act to be done in its performance is not clearly ascertainable. It is therefore incapable of enforcement against any specific property. (*Berry* v. *Woodburn,* 107 Cal. 508, [40 Pac. 802]; *Magee* v. *Manus,* 70 Cal. 556, [12 Pac. 451]; *Stanton* v. *Singleton,* 126 Cal. 664, [47 L. R. A. 334, 59 Pac. 146]; *Meyer* v. *Quiggle,* 140 Cal. 498, [74 Pac. 40]; Civ. Code, sec. 3390, subd. 6; 2 Devlin on Deeds, sec. 1010.) Furthermore, all right of action to enforce the contract in equity is clearly barred by laches. The water quitclaimed to the Fairview Company was always insufficient to irrigate the Fairview tract, yet for the entire period from the making of the contract in 1887, until a few months before this action was begun, no water was ever demanded under the contract either by the Fairview Company, or its successors in interest or by any of the plaintiffs, and the validity of the contract as a conveyance or agreement to convey an interest in the waters of the Hemet Company was never at any time recognized by that company. The action was begun on October 29, 1908. The statutory period of limitation had run over and over again. For these reasons we conclude that the plaintiffs have established no right or specific interest in the water belonging to The Lake Hemet Water Company.

There is some discussion of the proposition that the Hemet Company is a public service corporation and that the plaintiffs as beneficiaries of the public use are entitled to take water from its system. There is no direct evidence that the Hemet Company is distributing its water to the public, or for general use, or that its water is, or has been, dedicated to the use of the public or any part thereof. But if it is conceded that its water is devoted to the public use, there is no evidence to show that the lands of the plaintiff are within the area to which such water has been dedicated, or that they are entitled to water from that system, or that the company has any surplus to apply to lands not within the original dedication. (See *Montecito etc. Co.* v. *Hildreth,* 139 Cal. 29, [75 Pac. 395]; *Thayer* v. *California Dev. Co.,* 164 Cal. 117, [128 Pac. 21].) It follows from these considerations that the judgment

and order appealed from, so far as The Lake Hemet Water Company is concerned, are correct and should be affirmed.

2. For a proper understanding of the differences between the plaintiffs and The Fairview Land and Water Company, a more elaborate statement of facts is necessary. There is no substantial conflict in the evidence as to the facts about to be stated. In the early part of the year 1887, that company, which we will hereafter designate the Fairview Company, was the owner of a tract of land containing 2897 acres of land known as the Fairview Tract, abutting upon the San Jacinto River and being a part of a larger tract comprising a Mexican grant known as the Rancho San Jacinto Viejo. This tract being riparian to the stream, the company had the right to use the water upon the land and to that extent it owned an interest in the waters of the river. Its right was limited to the portions of the stream quitclaimed to it by the contract hereinbefore mentioned between it and the Hemet Company, but it was obviously a riparian right. The land and the water together were very valuable; separately, the land, at least, was comparatively worthless. The Fairview Company adopted the plan of selling the land in parcels together with a share of the water, charging a lump sum for each parcel of land combined with a proportionate share of the water. For this purpose it had the land surveyed and subdivided partly into town lots and partly into parcels of twenty acres each. Thereupon it announced that it had a water supply for the use of such land; that it would pipe such water to each parcel thereof so surveyed, and that it would sell the land with the right to receive a proportionate share of the water for use thereon at the prices fixed. In order to carry out this plan respecting the water, the Fairview Company, through its board of directors, organized a subsidiary company, called the Florida Water Company, with a capital stock of twenty thousand shares of the nominal par value of five dollars each. To the Florida Company it conveyed all of its rights in the water of the San Jacinto River and its tributaries aforesaid, receiving in exchange therefor all the said stock of the Florida Water Company, except fifty shares which were retained to be used to qualify persons to act as directors and which were accordingly issued to persons designated by the Fairview Company, who thereupon became di-

rectors of the Florida Company. The certificates issued by the Florida Company, as evidence of its shares of stock, each declared in substance that for each share of such stock the holder thereof was entitled to one-twenty-thousandth part of the water belonging to the Florida Company. Thus, in effect, the water-right attached to this land became the property of such stockholders. The purpose of the Fairview Company in organizing this auxiliary company, was to facilitate the sale of a proportional part of the water-right with each sale of a parcel of land. Accordingly each agreement of sale provided that five shares of said stock would be sold with each acre of land and one share with each town lot, and that the Fairview Company would pipe the water to each parcel. As the parcels were conveyed to the respective purchasers, the stock was transferred in accordance with the agreement. The agreement also provided that the stockholders of the Florida Company must thereafter bear the expense of keeping up the water system. The Fairview Company still remained the holder of a majority of the stock. Each purchaser of land in this manner bought and paid for his due proportion of the water-right. The money for the construction of dams and conduits necessary for the diversion and distribution of the water to the several parcels was furnished by the Fairview Company, partly before and partly after it deeded its water-rights to the Florida Company. That deed was dated May 20, 1887, but it was not acknowledged until August 3, 1887. Until the year 1892, the directors of the Florida Company distributed the water to the parcels of land which had thus been sold by the Fairview Company. These directors were elected by the Fairview Company through its ownership of a majority of the stock of the Florida Company, and they acted at all times in harmony with the wishes of the directors and managers of the Fairview Company. Up to this time no specific charge appears to have been made for the distribution of water, but there were occasional assessments upon the stock of the Florida Company, to pay expenses, and they were paid by the respective stockholders without objection. The expense of keeping up the repairs of the water system was, for the most part, paid by the Fairview Company, whether out of these assessments or not does not appear. In 1892, there was an attempt made under the state law to organize

an irrigation district in that vicinity. In November of that year the Fairview Company made a formal transfer of all the stock which it then owned in the Florida Company, being some fourteen thousand eight hundred shares, to the irrigation district, taking in exchange therefor, bonds purporting to have been issued by said district. At that time it was supposed that the irrigation district had a legal existence. Thereafter the directors of the Florida Company were elected by persons claiming to act as directors of the irrigation district, so-called, they being in control of a majority of the shares of the stock of the Florida Company, and these Florida Company directors continued to distribute the waters of the system to the respective owners in proportion to their interest. This method continued until July, 1899. During this period it was found necessary to make charges against the water users for the expense of repairs and service and such charges were made and paid without objection by the plaintiffs. Sometime after the supposed organization of the district its legality was attacked by an action for that purpose and on July 11, 1899, the superior court of Riverside County adjudged that it had not been legally organized, and never had a legal existence. Its bonds were, therefore, utterly void. At the same time the Florida Company practically ceased to act as a corporation and abandoned all right or claim to the waterworks known as the Florida system and to the water-rights previously conveyed to it by the Fairview Company. The Fairview Company thereupon took charge of the water system and thenceforward managed and controlled the same, diverting and distributing the waters to the parcels of land which it had previously sold with water stock. Upon taking charge thereof, it gave notice to each of such landowners that it had taken control of the system and would distribute the water to them in such quantities as they might desire, upon payment of charges to be imposed. It continued to do so from that time until shortly before this action was begun, without any objection or dispute arising between it and the plaintiffs. Concerning the amount of the charges to be imposed, there is no evidence that it gave notice to the plaintiffs that it claimed the right to charge for any other purposes than to cover the cost of repairs and a reasonable charge for the expense of distribution. Nor did it at any time deny that the several

plaintiffs had the right, under the sales of land with the Florida Water Company stock, by which their lands were originally acquired, to participate in the use of the water belonging to the system. It did, however, fix its charges according to the quantity of water delivered, and made no attempt to apportion the water between the several landowners in proportion to their respective shares of Florida stock. But it never announced or notified the landowners that this was done in repudiation or denial of their title to a share of the water.

Upon these evidentiary facts the court declared in its findings that the Fairview Company did not sell the lands in question together with water for irrigation and domestic use thereon; that the Florida Company was not formed to hold and control the water for the convenience of the Fairview Company; that there was no intention that the Florida Company, in taking title to the water, should act as agent of the Fairview Company to distribute said water to the purchasers of land from said Fairview Company; that the Fairview Company did not control the appointment of officers and agents of the Florida Company or the election of its directors or direct its policy and business up to the year 1892; that the certificates of stock in the Florida Company declared that each owner of a share was entitled to one-twenty-thousandth part of the water owned by that company, but that, in fact, such holder did not thereby become entitled to said share of said water; and that from the time the Fairview Company took possession of the water supply and water system on July 11, 1899, until the beginning of this action, its possession was adverse, not only to the Florida Company, but also adverse to all claim of the plaintiffs or either of them to a right or share in said water supply, and that its said possession was under a claim by the Fairview Company that it was the absolute owner of the water and had the right to impose charges for the sale or delivery thereof to the plaintiffs in excess of the amount required for the expenses of keeping up the system and a fair remuneration for the service, and, in effect, that the Fairview Company was the absolute owner of the water and water supply, so far as the charges therefor were concerned.

We think that these findings are contrary to the legal effect of the facts we have stated.

The water-right in question was a riparian right arising from the fact that the lands abutted upon the river. It originally extended and attached to every part of the Fairview Tract. The device of organizing the Florida Water Company, transferring to it the water-right, receiving immediately from it certificates of stock declaring the holder of each share entitled to a proportional part of the water-right, and thereupon selling the land in parcels together with a proportional number of the shares of stock, was a scheme for the apportionment of the water-right to the several parcels of land so that each could thereafter be conveniently sold with its proper share of the water-right. In effect it preserved the riparian right to the several parcels of land, regardless of their proximity to the stream, and vested in the owner of each parcel, as soon as it was sold to him, a proportional part of the riparian right originally held by the Fairview Company in the waters of the stream. That such riparian right can be thus preserved in parcels which do not border upon the stream when, by the conveyance, they are severed from the original riparian tract, is fully settled by the decisions in this state. (*Strong* v. *Baldwin*, 154 Cal. 157, [129 Am. St. Rep. 149, 97 Pac. 178] ; *Rose* v. *Mesmer*, 142 Cal. 328, [75 Pac. 905] ; *Anaheim etc. Co.* v. *Fuller*, 150 Cal. 331, [11 L. R. A. (N. S.) 1062, 88 Pac. 978] ; *Verdugo etc. Co.* v. *Verdugo*, 152 Cal. 663, [93 Pac. 1021] ; *Hudson* v. *Dailey*, 156 Cal. 624, [105 Pac. 748].) How far such an apportionment or transfer is good against owners of other riparian lands upon the same stream, not part of the tract from which such parcels are conveyed, we need not consider, since none of such other owners are parties to or concerned in this suit.

The certificates of stock declared that the holder thereof was "entitled" to a certain part of the water "belonging to" the Florida Water Company. The clear intent of this language, and its legal effect, was to transfer to the holder the title to that part of the water, the same title which the Florida Company held at the time. The Florida Company paid no consideration for the water, except by the issuance of this stock to its vendor. Its holding of the title during the infinitesimal point of time between its receipt of the conveyance of the water and the delivery of these certificates in exchange, was a holding as a naked trustee for the benefit of

its vendor, the Fairview Company. That holding did not change the nature of the right, nor divest the beneficial interest therein from the Fairview Company which still remained the owner of the land. When, thereafter, the Fairview Company sold parcels of the tract to the plaintiffs and others with the accompanying certificates of stock, the right to a share of the water passed to the purchaser and it remained, as before, a riparian right growing out of the situation of the Fairview Tract as land abutting the stream.

When such parcels were sold in this manner, with the certificates of stock carrying the water-right, the Fairview Company immediately became a tenant in common of the water-right with the purchaser, each being entitled to his proportional share therein. As the Fairview Company had actual control of the operations of the Florida Company, by reason of the fact that it held a majority of the stock and did in fact select its directors, and as by that means it was in practical control of the waterworks and the distribution of the water for the benefit of all the owners thereof, it stood in the relation of trustee for the owners of the several parcels of land so conveyed. During the time the persons in control of the irrigation district selected the directors of the Florida Company, they occupied a similar trust relation to the several landowners. It is proper to consider in this connection the effect of the purported transfer of the stock to the irrigation district. The authorities are apparently unanimous to the effect that a contract purporting to transfer property to a fictitious person, or to one who is dead at the time, or to a corporation having no legal existence, passes no title at all, but that the title to the property attempted to be transferred remains in the transferrer. (*Muskingum Co.* v. *Ward,* 13 Ohio 127, [42 Am. Dec. 191] ; *Hunter* v. *Watson,* 12 Cal. 376, [73 Am. Dec. 543] ; *Phelan* v. *San Francisco,* 6 Cal. 541; *Jackson* v. *Cory,* 8 Johns. (N. Y.) 388; *Douthitt* v. *Stinson,* 63 Mo. 278; *Harriman* v. *Southam,* 16 Ind. 190.) There are cases holding that if the corporation has a legal existence, but is merely incapable of holding the particular property, the transfer is good as to all persons except the state which created the corporation. But this exception has no relation to this case, for here the irrigation district never had a legal existence. The result is that the transfer to the irrigation district was wholly void and

the legal title to the stock, notwithstanding that transfer, re-
mained in the Fairview Company and it is now the owner
thereof with the corresponding shares of the water-right which
they carry. When, therefore, in July, 1899, the Fairview
Company took possession of the waterworks of the Florida
water system, it still remained a tenant in common of the
water-right with the other landowners in the Fairview Tract,
and it still stood in the relation of a trustee to them with
regard to the control of the waterworks and the distribution
of the common supply of water.

It may be conceded that the act of the Fairview Company
in taking possession of the waterworks in 1899 and thereafter
holding the same and continuing the operation thereof, was
adverse to the right and title of the Florida Company thereto,
and that after such possession had continued for five years
without interruption, whatever right, title, or interest the
Florida Company had to the waterworks or to the water sup-
ply, thereupon passed to and became vested in the Fairview
Company. This fact, however, does not, of itself, divest the
title and right of the plaintiffs. The Florida Company had
the title to the waterworks and pipes, whether as trustee or
otherwise, it is not important to determine. But it did not
hold the title to the water-right or to the water. That title,
as we have seen, had passed to the holders of the certificates
of stock, and the plaintiffs and the Fairview Company were
tenants in common thereof. In order to make the possession
of the Fairview Company adverse to the plaintiffs and to their
right and title to the water thus acquired by them, it was
necessary for the Fairview Company, occupying as it did the
position of trustee toward plaintiffs, and tenant in common
of the water supply with them, to distinctly inform them that
it repudiated their claim and right to a share of the water,
under their water stock, and that it claimed the ownership of
all the water adversely to their title. If it claimed the right
to impose charges to cover more than the cost of upkeep and
a fair charge for the service of administering the system, it
was necessary, under these circumstances, that it should make
such claim clearly known to the plaintiffs and give them notice
that its charges were for other purposes; otherwise, its con-
duct in taking possession of the works and distributing the

water for all concerned would not be adverse to the title of the plaintiffs and their right to receive a proportion thereof.

The mere fact that charges were imposed did not make its possession adverse. Similar charges had been imposed before and were to be expected. The original understanding was, and the original plan and the said agreements of sale of the parcels plainly imply it, that charges would be imposed from time to time as they became necessary to repair the works and pay the expense of distribution. During the time the irrigation district officers controlled the system such charges were made, but it does not appear that plaintiffs were informed or believed that by paying such charges they were yielding the ownership of the water which they had bought and paid for. The imposition of charges by the Fairview Company, when it began distributing the water, did not give the plaintiffs notice that their right or title to their proportional share of water was disputed or invaded. They would reasonably suppose that the charges were imposed because of the necessity of raising money to defray the expense of repairs and the cost of the service. The evidence indicates that this was the sole purpose of imposing such charges as were made. The evidence also shows that the information given to the plaintiffs was that the charges were made because of the necessity of raising money for that purpose. There is no evidence that any other purpose was stated to any of the plaintiffs. We cannot perceive that the fact that the water was delivered as called for and that the charges were fixed by the quantity and without regard to the proportional share of each person, is of any weight as proof of an adverse claim by the Fairview Company. There was no declaration or notice that such method was followed in pursuance of any adverse claim against the right of the plaintiffs. The natural inference would be that it was done in that manner because it was the fairest method of apportioning the common expense. The plaintiffs were given no information that it was done for any other reason. It was not, in itself, incompatible or inconsistent with the ownership of a share of the water supply by the respective landowners. We think, therefore, that the finding of adverse possession, so far as it is intended to declare that the plaintiffs lost their right to their proportional share of the water because of such adverse possession, is contrary to the evidence.

Since it does not appear that the charges imposed by the Fairview Company exceeded the amount necessary to pay the cost of the service and expense of upkeep, it might be plausibly claimed that the judgment is not injurious to the plaintiffs. But the difficulty with this suggestion is that the findings declare that the entire water supply now belongs to the Fairview Company, and the judgment goes upon the theory that it may fix its charges as absolute owner thereof, and that the plaintiffs have no right whatever therein, except the right to buy water at such rates as may be legally fixed or imposed. If this be true, it may fix the charges at a rate which will give it a revenue upon the actual value of the water supply itself, a proportional part of which, as we have seen, belongs to the plaintiffs and not to the said company. Thus it would be able to make the plaintiffs pay again for the water-right which they had previously bought and paid for in connection with the purchase of their lands. It appears that the Fairview Company, since it took charge, has expended a considerable sum of money in renewing and repairing the pipes and conduits of the system. No doubt it has a just right, as a part of its charge for the delivery of water, to include a sum sufficient to cover plaintiffs' proportionate shares of the interest on this investment, and perhaps to enforce contribution of the principal. But it would have no right to base its charge upon the theory that it is the owner of the water delivered to plaintiffs and that it is, consequently, entitled to a reasonable return upon the value of that water considered as an investment. If it does not intend to charge rates on this basis, the suit should be capable of a quick settlement, by a judgment containing a provision that it shall not do so.

For somewhat similar reasons we are of the opinion that the decision that the lands of McCunn and others above mentioned had no right to the water is erroneous. This conclusion seems to have been based on one or the other of two theories; 1. That their right to the use of the water is that of an appropriator under the provisions of the Civil Code, and that under section 1411 the right ceased when they ceased to make a beneficial use of the water; 2. That their holding is as of a title by prescription, in the nature of a servitude or easement acquired by enjoyment, which, under section 811 of the Civil Code, is extinguished by a disuse thereof for five years. There

is evidence to the effect that these lands, or some of them, were not irrigated or served with the water for periods of at least five years. The fact that a new trial must be ordered makes it proper to consider these questions.

Assuming that the right is of a nature which would place it in one or the other of these classes, the conclusion that the right has ceased or has become extinguished, under the circumstances here existing, by no means follows: It might be so if a third person were claiming the water in opposition to all the parties to this action. But this is not such a case. Here the right was originally gained by the Fairview Company. If it was by diversion or appropriation, that company made it for use on these particular lands, and the diversion, or appropriation, has ever since that time been made by that company or its intermediaries, for the benefit of all the parties. The plaintiffs all derived their titles from and are holding under that company. Where one thus diverting the water and thereby acquiring a water-right, whether by prescription or statutory appropriation, sells an interest in it to another and thereafter continues to divert the water himself for the vendee, the fact that the vendee does not demand or use the water he has bought may, if it is not otherwise beneficially used by some one receiving it from the appropriator, enable some third person to take such unused water and defeat the right of the first appropriator, upon the theory that such part has not been by him applied to a beneficial use. But we do not understand the law to be that such failure to receive or use the water by the vendee will forfeit his right thereto to the vendor who has in the mean time continued the diversion, unless such vendor in some manner informs the vendee that such forfeiture will be claimed because of nonuse, or asserts it against him by some hostile act. Mere failure to take and use the water for which he has, at the time, no need, will not forfeit the right to the vendor, in such a case.

With respect to the theory that it is an easement or servitude originally acquired by enjoyment, it may be said further that, so far as the Fairview Company is concerned, it having acquired the right and thereupon transferred it by contract to the plaintiffs, it is not, as between them and the company, a right acquired by prescription, but it is a right which they have acquired from the company by conveyance, and the doc-

trine that an easement acquired by use is lost by mere disuse does not apply to a right gained in that manner. (*Smith* v. *Worn*, 93 Cal. 212, [28 Pac. 944] ; *Currier* v. *Howes*, 103 Cal. 437, [37 Pac. 521] ; *Walker* v. *Lillington*, 137 Cal. 403, [70 Pac. 282].)

But there is no evidence of such appropriation or right by prescription. The right, as we have stated, is a riparian right, and its nature has not been changed. The purpose of the original plan was to preserve to each parcel of land its proportional right to the water. It does not appear that there was any intention to sever or destroy the riparian right, or to convert it into a right of a different character. The fact that the transfer was made through the agency and by means of the stock of the Florida Water Company does not substantially change the nature of the transaction, or the nature of the right transferred. The transfer of the water-right to that company was simultaneous with the retransfer thereof to the Fairview Company by virtue of the issuance to it of the entire capital stock. It was form without substance. It may be conceded that the result of this arrangement would be that by transferring his stock alone, without selling the land, the owner of a parcel would enable the vendee of the stock to have the water delivered to other land and thus the water and the land would be effectually separated. But none of these plaintiffs have done this and the right of each of them has preserved its riparian character. Such a right is not lost by mere disuse. The evidence does not show that the Fairview Company in any way manifested its intention to take and hold adversely to them the water to which these lands were entitled. Until it did manifest such intention to them, its title against them by prescription would not begin to run. The case, it appears, was not tried upon the theory that this was necessary.

The judgment and order are affirmed as to The Lake Hemet Water Company. As to The Fairview Land and Water Company, the judgment and order are reversed and the cause is remanded for a new trial of the issues so far as they affect the rights of plaintiffs against that company and in accordance with the views herein expressed.

Henshaw, J., Melvin, J., Angellotti, J., and Sloss, J., concurred.