Filed 8/8/25
Opinion following rehearing

# CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SANDTON AGRICULTURE INVESTMENTS III, LLC et al., | F086484 |
| Plaintiffs, Cross-defendants and Respondents, | (Super. Ct. No. 21CV-02712) |
| v. | **OPINION** |
| 4-S RANCH PARTNERS, LLC, | |
| Defendant, Cross-complainant and Appellant. | |

APPEAL from a judgment of the Superior Court of Merced County. Brian L. McCabe, Judge.

Gilmore Magness Janisse, Christopher E. Seymour; Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball and Catherine E. Bennett for Defendant, Cross-complainant and Appellant.

Wanger Jones Helsley, Kurt F. Vote, John P. Kinsey and Steven K. Vote for Plaintiffs, Cross-defendants and Respondents.

-ooOoo-

Appellant, 4-S Ranch Partners, LLC (4-S Ranch), is the former owner of approximately 5,257 acres of land in Merced County. The land overlies an aquifer

---

<sup>*</sup>Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of Discussion.

capable of holding over 500,000 acre-feet of water. During the period of 4-S Ranch's ownership, the land was sometimes inundated with what 4-S Ranch characterizes as "floodwater" from the Eastside and Mariposa Bypasses of the San Joaquin River. Such events caused water to accumulate in the aquifer by natural processes of seepage and percolation.

4-S Ranch pledged the land as security for a loan on which it subsequently defaulted. When the lender foreclosed, 4-S Ranch claimed the water in the aquifer was its personal property and not part of the collateral. The lender purchased the land by credit bid at a nonjudicial foreclosure sale, then filed a declaratory relief action to confirm its rights and determine the legal classification of the water. 4-S Ranch cross-claimed to set aside the foreclosure sale. The lender prevailed on all issues, with the trial court ruling as a matter of law that the water and all rights thereto were part of the real estate and not personal property. This appeal followed.

California water law has been described as arcane (e.g., *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 362), but some concepts are so well established as to be considered hornbook principles. "Water in its natural state is a part of the land and therefore real property. When severed from the realty, reduced to possession, and placed in containers, it becomes personal property." (13 Witkin, Summary of Cal. Law (11th ed. 2017) Personal Property, § 108, p. 122; accord, 51 Cal.Jur.3d (2025) Property, § 28 ["Although water ordinarily is considered realty, it becomes personalty when it is severed from the soil and is appropriated or sold" (fn. omitted)]; 1 Slater, California Water Law and Policy (2024) § 10.07, p. 10-73 ["Water rights are an interest in real property. … However, once water is severed from the land, water may become personalty" (fns. omitted)].) It is undisputed that the subject water was not severed from the land.

4-S Ranch argues floodwater is a special class of water that becomes the personal property of anyone who exercises dominion and control over it, without any requirement of severance from the land. 4-S Ranch asserts this position with ostensible confidence,

2.

but without any supportive authority. The entire appeal is staked upon dictum in an obscure appellate court decision from 1913. The case, *Dannenbrink v. Burger* (1913) 23 Cal.App. 587, did not involve floodwater or any issues relevant to the present dispute.

An appealing party has the burden to affirmatively demonstrate grounds for reversal. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) 4-S Ranch falls well short of meeting its burden. The judgment will thus be affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

*Prelitigation Background*

The subject land consists of 17 assessed parcels comprising approximately 5,257 acres in total size (the Land). In 2009, the Land was purchased by Merced Falls Ranch, LLC (Merced Falls Ranch) for a reported sum of $11.5 million. Merced Falls Ranch was/is wholly controlled by an individual named Stephen W. Sloan. According to a declaration in the record, Sloan is also the "sole managing member" of 4-S Ranch. In court filings, 4-S Ranch has described Sloan as a farmer and sophisticated "businessman" with expertise "in moving water around California by way of sales and transfers."

In 2013, 4-S Ranch acquired title to the Land from Merced Falls Ranch. The exact nature of this transaction is unclear from the record, but 4-S Ranch has described it in court filings as a purchase made with financing from a nonlitigant, North Star Investment Holdings, LLC (North Star). If a sale did occur in 2013, the purchase price is not disclosed in the record.

In August 2017, 4-S Ranch borrowed approximately $33 million from respondent Sandton Credit Solutions Master Fund IV, LP (Sandton Credit). The purpose of the loan, according to 4-S Ranch, was "to refinance the debt owed to North Star to allow for the continued improvement of [the Land] to operate [in compliance with California's Sustainable Groundwater Management Act (Wat. Code, § 10720 et seq.)]." The loan from Sandton Credit was secured, inter alia, by a deed of trust against the Land.

Under the written loan agreement and deed of trust, the collateral for the Sandton Credit loan included the Land, all "Improvements" thereupon (defined to include wells, pumps, and other equipment), and related "Water Rights." The term "Water Rights" was defined as "all of [4-S Ranch's] right, title and interest in all water (including any water inventory in storage), water rights and entitlements, other rights to water and to receive water, and water rights of every other kind or nature, that serve the Land, including, without limitation, stored water, groundwater, surface water, riparian rights, drainage rights, and all rights to obtain water from governmental water district and non-governmental water companies including rights under groundwater sustainability or management plans and related judicial or administrative decisions.…"

### *Loan Default and Bankruptcy Proceedings*

On March 2, 2020, 4-S Ranch filed a voluntary petition in the United States Bankruptcy Court for the Eastern District of California seeking relief under chapter 11 of the United States Bankruptcy Code.[1] Two weeks later, 4-S Ranch filed its schedules of assets and liabilities. In those schedules, 4-S Ranch acknowledged indebtedness to Sandton Credit in the approximate amount of $57 million. 4-S Ranch also claimed to have over $700 million in assets, consisting primarily of the Land and "stored water" underneath the Land. The Land was said to be worth $500 million (as valued by 4-S Ranch). The "stored water," which it classified as inventory, (i.e., personal property) was estimated to be worth an additional $200 million (500,000 acre-feet of water valued at $400 per acre foot).

On the same day 4-S Ranch filed its bankruptcy schedules, Sandton Credit filed a motion for relief from stay.[2] The motion was supported by a declaration from Robert

---

[1]"Chapter 11 of the Bankruptcy Code enables a debtor company to reorganize its business under a court-approved plan governing the distribution of assets to creditors." (*U.S. Bank N.A. v. Village at Lakeridge, LLC* (2018) 583 U.S. 387, 389.)

[2]"The filing of a bankruptcy petition brings a bankruptcy estate into being and triggers an automatic stay, which prevents creditors from enforcing their claims, thus preserving the debtor's assets for ultimate distribution by the bankruptcy trustee." (*Sherwood Partners*, *Inc. v. Lycos*,

Rice, a Sandton Credit representative. The declaration states that Sandton Credit's "primary business is investing in alternative credit opportunities, including providing rescue finance to troubled companies," and it "specializes, in part, in making loans to struggling business[es] in need of capital to continue operations." The Rice declaration explains in detail the relevant events preceding the bankruptcy case.

The principal amount of the August 2017 loan was originally $33,075,887.92. The parties agreed "the principal balance would accrue interest based on a 360-day year in two (2) ways: (l) regular interest at a rate of 7% per annum ('Cash Interest'); and (2) deferred interest, or payment-in-kind interest, at a rate of 9% per annum ('PIK Interest')." In the event of default, the Cash Interest rate would increase to 10 percent and the PIK Interest rate would increase to 12 percent. 4-S Ranch elected to convert Cash Interest to PIK Interest during the first 12 months of the loan in lieu of making monthly payments.

By 2019, 4-S Ranch had defaulted in several ways. With exception of a one-time payment of $200,000 applied to Cash Interest, it had failed to repay any portion of the loan. 4-S Ranch also failed to satisfy a condition that it "maintain a trailing 12-month minimum EBITDA [earnings before interest, taxes, depreciation, and amortization] of $2,000,000 as of December 31, 2018 and thereafter." Another loan term required 4-S Ranch to pay Sandton Credit "75% of its 'Free Cash Flow,' defined as [4-S Ranch's] earnings from sales of water, crops, rents or other funds produced by the real property pledged as collateral for the Loan." Declarant Rice averred that the Land did not generate any revenue during the life of the loan.

In May 2019, Sandton Credit and 4-S Ranch entered into a loan forbearance agreement, which was later amended. In September 2019, after 4-S Ranch failed to meet

_Inc._ (9th Cir. 2005) 394 F.3d 1198, 1204, citing 11 U.S.C. §§ 301–303, 362.) The bankruptcy court may lift the automatic stay for cause, including lack of adequate protection of a creditor's interest in property, or if there is no equity in the property at issue and such property is not necessary for an effective reorganization. (11 U.S.C. § 362(d)(1), (2).) The automatic stay may also be lifted pursuant to a stipulation between the debtor and creditor. (See Fed. Rules Bankr. Proc., rule 4001(d)(1)(A)(iii).)

its obligations under the forbearance agreement, Sandton Credit commissioned appraisals of the loan collateral in anticipation of foreclosure. Appraisals were obtained for both the Land and additional real estate upon which the loan was secured. Based on the third-party appraisal, the Land had an estimated value of $14,985,000 as of October 2019. The additional collateral reportedly appraised for $12,520,000.[3]

In his declaration, Robert Rice explained the appraisals "did not account for the speculative value of any water rights accompanying each property." This caveat was also made clear in the appraisal report for the Land, which was attached to the declaration as an exhibit. For example, the report stated the appraisal did not include the value of "any ability of extracting groundwater for offsite sale or transfers." The report also noted the valuation "exclude[d] any subsurface water, oil, gas, or mineral rights inherent to the subject property."

On or about October 30, 2019, Sandton Credit and 4-S Ranch entered into a "further forbearance agreement," which gave 4-S Ranch an additional seven weeks to cure the default. 4-S Ranch failed to perform as promised, but Sandton Credit agreed to extend the forbearance period to February 28, 2020. 4-S Ranch again failed to meet its obligations, and by then the loan balance exceeded $57 million due to the unpaid principal, accrued interest, and substantial fees (e.g., $3 million in unpaid forbearance fees).

At the end of the final forbearance period, Sandton Credit initiated foreclosure proceedings. The bankruptcy petition was filed two days prior to the scheduled date of a nonjudicial foreclosure sale of the Land. 4-S Ranch has acknowledged it filed for bankruptcy protection "to prevent that foreclosure sale."

4-S Ranch filed an opposition to the motion for relief from stay. In pertinent part, it argued Sandton Credit was ignoring "the value of all associated or appurtenant water,

---

[3]The additional collateral was separately owned by Stephen W. Sloan, who had personally guaranteed the loan. Therefore, the additional collateral was not part of the bankruptcy estate, nor is it otherwise relevant to the present case.

water rights, water-related assets and water interest of the [Land] that [was] secured by [Sandton Credit's] deed of trust ...." 4-S Ranch further argued, "Movant asserts that there is no equity in its collateral based upon the Loan's total outstanding balance of $57,264,545.54 and ... that the [Land] has a fair market value of only $14,985,000 based upon an appraisal commissioned on or about October 21, 2019. [Citation.] However, the appraisal used as evidence of the fair market value of the [Land] does not assign any value to Water Rights and only provided a value to the surface rights of the land." 4-S Ranch quoted the definition of "Water Rights" from the deed of trust, adding italics to the words, "*including any water inventory in storage*" and "*stored water.*" 4-S Ranch concluded its argument by stating, "Based upon the inventory of 500,000 acre-feet of non-client water worth $200,000,000 alone, there is significant equity in the Loan's collateral." Sandton Credit has argued the statements in 4-S Ranch's opposition brief constitute judicial admissions that all water beneath the Land was part of the collateral for the loan.

Elsewhere in the opposition brief, 4-S Ranch alleged the Land was appraised by "an accredited rural appraiser" in 2010, and the "[a]ppraisal assigned the land and water supply a value of Eleven Million Five Hundred Thousand ($11,500,000)"—i.e., the same amount Merced Falls Ranch had reportedly paid for the Land one year earlier, in 2009. In addition, the appraiser allegedly determined the value of potential future water sales to be $225 million. 4-S Ranch thus alleged the Land, "including the water supply, plus added value of the existing water supply for sale outside of the property had a fair market value of [$236,500,000] as of September 7, 2010." No explanation was provided for its belief that the Land alone had exponentially increased in value from $11.5 million to $500 million in less than 10 years.

4-S Ranch further claimed to have generated over $15 million in groundwater sales to the Del Puerto Water District between October 2014 and October 2016. It was suggested, however, that those sales were uniquely attributable to the Governor declaring

"a State of Emergency because of drought and related water shortages" at the time.  4-S Ranch went on to state, "While the passing of [the] Sustainable Groundwater Management Act ('SGMA') in 2014 has hindered [4-S Ranch's] groundwater pumping and transfer operations, [4-S Ranch] has been rigorously working to shift the operation of the business from the sale [of] groundwater to water storage and sales of water inventory from intentional flooding of the [Land] that has an extraction capacity of 50,000 acre-feet per a year from eighteen (18) wells." (*Sic.*)

The planned shift in "the operation of the business" was dependent in part upon a complex permitting process involving the State Water Resources Control Board.  4-S Ranch claimed to be only "one permit away from being fully operational," which it expected to obtain within six months, i.e., by October 2020.  If the final permit could not be obtained, it had alternative strategies to generate tens or even hundreds of millions of dollars from the Land within a five-year period.  Those plans included "attain[ing] public agency status for the purposes of managing ground water resources … and becoming a Groundwater Sustainability Agency," leasing the Land to public water districts, or selling the Land to investors.

In December 2020, while the motion for relief from stay was still pending, Sandton Credit and 4-S Ranch entered into a stipulation.  4-S Ranch acknowledged it owed the outstanding loan balance and associated costs, which had grown to over $66 million, and the amount due would increase by approximately $31,500 "each additional day past December 8, 2020."  4-S Ranch agreed to pay all the money it owed to Sandton Credit by March 31, 2021.  4-S Ranch further agreed Sandton Credit's motion for relief from stay would be granted, "effective April 1, 2021, and the 14-day stay provided by way of Federal Rule of Bankruptcy Procedure 4001(a)(3) [would] not apply."  The bankruptcy court approved the stipulation.

On March 15, 2021 (two weeks prior to the repayment deadline), 4-S Ranch filed an amended disclosure statement regarding a proposed plan of reorganization.  Within the

19-page document, 4-S Ranch alleged the Land had "a large supply of abandoned flood water from easements that allow the state government to divert flood flows onto the [Land] as part of flood control projects." 4-S Ranch also made a cursory assertion (without citing any authority) that the "flood flows … are personal property once they arrive at the [p]roperty," i.e., once such water traverses the Land. In other parts of the document, however, 4-S Ranch stated the "500,000 acre-[feet] of stored water inventory listed on [its bankruptcy schedules] … is appurtenant to the [p]roperty," i.e., appurtenant to the Land. It further submitted that the "collection, storage, and sale of water is tied to the rights associated with the ownership of the [Land]."

4-S Ranch failed to meet its financial obligations under the parties' stipulation. The automatic stay was lifted effective April 1, 2021. The bankruptcy case was reportedly dismissed on August 10, 2021.[4]

***The Present Litigation***

On April 29, 2021, the Land was publicly auctioned at a nonjudicial foreclosure sale. Sandton Credit was one of three bidders, and it purchased the Land with a credit bid of $20 million. The trustee's deed of sale identified Sandton Credit as the foreclosing beneficiary and grantee of all right, title, and interest in the Land as secured by the deed of trust.

In May 2021, Sandton Credit transferred the Land by quitclaim deed to respondent Sandton Agriculture Investments III, LLC (Sandton Agriculture). Sandton Credit and Sandton Agriculture are henceforth referred to collectively as "Sandton."

On August 11, 2021, Sandton filed a complaint for declaratory relief in the Merced Superior Court. The complaint named 4-S Ranch as the defendant and asserted a single cause of action regarding an "actual controversy" over whether 4-S Ranch had

---

[4]Sandton Credit and 4-S Ranch have both alleged in pleadings that the bankruptcy case was dismissed on this date, i.e., one day prior to the filing of Sandton Credit's complaint for declaratory relief in the present lawsuit. We say "reportedly" only because the information is not otherwise corroborated by the record on appeal.

9.

"any remaining interest in the [Land] and associated water rights (whether characterized as surface water, groundwater, stored water, or otherwise)." Among other pleaded contentions, Sandton argued 4-S Ranch was "estopped as a matter of law from asserting any ongoing interest in the water rights associated with the [Land] as personal property, based upon its prior judicial admissions to the contrary." Sandton requested "a judicial determination as to the extent of [4-S Ranch's] interest in the [Land] and its associated water rights," if any.

In September 2021, 4-S Ranch answered the complaint and filed a separate cross-complaint against Sandton. The cross-complaint was twice amended for reasons that included naming WT Capital Lender Services as an additional cross-defendant. WT Capital Lender Services is a corporate entity that served as trustee in the foreclosure proceedings; it is not a party to this appeal. The claims asserted against Sandton in the second amended cross-complaint are discussed in other parts of this opinion.

***Sandton's Motion for Summary Adjudication***

In July 2022, Sandton filed a motion for summary adjudication of its cause of action for declaratory relief. The dispositive issues were framed in terms of "(1) whether the 'Water Rights' secured by the Loan Documents … constitute real versus personal property, and (2) whether these rights passed with [the Land] … upon non-judicial foreclosure." Sandton relied on case law holding that water is ordinarily classified as real property; water rights are treated as appurtenant to land and ordinarily pass with title and possession of the land in a conveyance of the same; and water ordinarily retains its character as realty unless and until it is completely severed from the land (e.g., *Stanislaus Water Co. v. Bachman* (1908) 152 Cal. 716, 724–726).

Sandton's motion was supported by a separate statement of undisputed material facts (UMFs), which mostly covered the factual and procedural history summarized above, including the bankruptcy proceedings. Sandton's UMF No. 13 asserted that the "surface water, ground water and/or stored water" on or underneath the Land was "never

10.

severed by 4-S [Ranch] or sold to a third person or entity." The response from 4-S Ranch to UMF No. 13 was as follows: "Undisputed, but irrelevant—the water at issue became personal property of 4-S [Ranch] as soon as the water came onto the 4-S Property, [i.e., the Land,] and remained personal property of 4-S [Ranch] at all times; no 'severance' or other act by 4-S [Ranch] was necessary for the water to be personal property and not real property."

In its opposition brief, 4-S Ranch argued "flood water on one's land is personal property to the extent control is exercised over it." The only case cited in support of this contention was *Dannenbrink v. Burger*, *supra*, 23 Cal.App. 587, which 4-S Ranch continues to rely upon in this appeal. The case of *Mogle v. Moore* (1940) 16 Cal.2d 1 was cited for the general proposition that "the right to control flood water is based on land ownership" (quote taken from the briefing below, not the *Mogle* opinion). No other authority was provided on the issue of classifying water as realty or personal property.

To further support its opposition, 4-S Ranch submitted a declaration from its manager, Stephen W. Sloan, and a separate statement of "additional facts." In pertinent part, the Sloan declaration explained the existence of two easement agreements previously entered into between 4-S Ranch's predecessors in interest (as grantors) and certain state and federal agencies (as grantees).

The first easement was granted in 1960 to the Sacramento and San Joaquin Drainage District (District) by a prior owner of the Land. As alleged in 4-S Ranch's "additional facts," which Sandton does not dispute, the easement authorized the District to "'construct, reconstruct, enlarge, repair, and operate and maintain'" various levees and bypasses associated with a flood control project for the San Joaquin River, including what are known as the Eastside and Mariposa Bypasses. The second easement was granted to the federal Bureau of Reclamation by 4-S Ranch's immediate predecessor in interest, Merced Falls Ranch, in 2013. Sandton does not dispute 4-S Ranch's allegation

that water flowing through the Eastside and Mariposa Bypasses pursuant to both easements "seeps into, and sometimes inundates, the [Land]."

According to the Sloan declaration, during the time 4-S Ranch owned the Land, 4-S Ranch "allowed" floodwater from the Eastside and Mariposa Bypasses to "inundate" the Land. 4-S Ranch allegedly "took possession and control of those waters" (how it did so was not explained), and the water was "allowed to see[p] into the shallow aquifer underneath [the Land] to be stored until extraction for sale to third parties." When it filed for bankruptcy protection in March 2020, 4-S Ranch allegedly "had a total inventory of 500,000 acre-feet of water stored in the shallow aquifer." In 4-S Ranch's opposition brief, the aquifer was described as being formed by a layer of Corcoran Clay.[5, 6]

Sandton's motion was argued in September 2022 and taken under submission after the hearing. In December 2022, the trial court issued a written decision in favor of Sandton. All of Sandton's UMFs were found to be undisputed (a finding 4-S Ranch does not challenge in this appeal). The trial court noted 4-S Ranch's "additional facts" were undisputed by Sandton, but it concluded those alleged facts did not establish "a triable

[5]An aquifer is an underground body of rock or sediment "that contains enough saturated permeable soils to yield significant quantities of water to produce wells or springs. Aquifers may also be referred to as a 'groundwater reservoir' or a 'water bearing formation.'" (2 Slater, California Water Law and Policy (2024) § 11.06, p. 11-17, fn. omitted; accord, *City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1198, fn. 1.) Cases involving underground water sometimes use the terms "basin" and "groundwater basin," which mean "'[a]n alluvial aquifer or a stacked series of alluvial aquifers with reasonably well-defined boundaries in a lateral direction and having a definable bottom.'" (*City of San Buenaventura*, at p. 1198, fn. 1.) "Alluvial," which is another term 4-S Ranch used to describe the aquifer in this case, refers to the general composition of the aquifer: "clay, silt, sand, gravel, or similar detrital material deposited by running water." (Merriam-Webster's Collegiate Dict. (11th ed. 2011) p. 34 [defining "alluvium"].)

[6]Corcoran Clay is a natural geological feature of many aquifers in the San Joaquin Valley. (See Merced County Code, § 8.12.030.) "Water entering the ground above the clay is effectively trapped on top of the clay, saturating the soil and forming a semi-confined aquifer above the clay." (Comment, *Selenium in San Joaquin Valley Agricultural Drainage: A Major Toxic Threat to Fish and Wildlife Inadequately Addressed by the Central Valley Project Improvement Act* (1996) 27 Pacific L.J. 303, 316.) Varying in thickness, the clay is "relatively impermeable and greatly slows water from traveling deeper into the ground." (*Ibid*. & fn. 85.)

issue of fact as to whether [4-S Ranch] retained any personal property interest in [the subject water] ….”  The trial court also overruled 4-S Ranch’s objections to some of Sandton’s evidence, which is not discussed in the appellate briefing.  We thus assume the objections were properly overruled.  (See *Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 [“an appellant’s failure to discuss an issue in its opening brief forfeits the issue on appeal”].)

In granting Sandton’s motion, the trial court cited and extensively quoted from cases explaining that the corpus of water in its natural state is not “owned” by anyone; water rights are generally considered an interest in real property; and the character of water is not transmuted to personal property unless it is severed from the realty.  The authorities included *Stanislaus Water Co. v. Bachman*, *supra*, 152 Cal. 716, and *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019.  Because it was undisputed the subject water was never severed from the Land, the trial court held the water was not 4-S Ranch’s personal property and all rights to the water passed to Sandton with the 2021 transfers of title to the Land.

The trial court also stated two alternative grounds for granting Sandton’s motion.  It was persuaded by Sandton’s estoppel argument, though for slightly different reasons than asserted in the complaint and summary adjudication motion.  The trial court further ruled “that even if [4-S Ranch] were to establish some basis for a personal property interest [in the water], such issue is outside the scope of the current pleadings because it was never alleged … in its answer” to the complaint.

Subsequent to the motion ruling, the trial court granted further relief prayed for in the complaint by awarding Sandton contractual attorney fees.  Neither Sandton’s entitlement to such fees nor the amount awarded are at issue in this appeal.

### Sandton’s Demurrers to the Second Amended Cross-complaint

All versions of 4-S Ranch’s cross-complaint alleged seven causes of action against Sandton.  Each cause of action was in some way derivative of, and based upon, 4-S

Ranch's contention that the water in question was its personal property. The record implies 4-S Ranch voluntarily amended the original cross-complaint. Sandton then filed a demurrer regarding three causes of action pleaded in the first amended cross-complaint, which was sustained with leave to amend.

The second amended cross-complaint was filed in October 2022, while Sandton's motion for summary adjudication was still pending. In December 2022, Sandton filed a demurrer regarding three of the seven causes of action pleaded in the second amended cross-complaint. This filing preceded the trial court's ruling on the motion for summary adjudication by approximately one week.

The demurrer filed by Sandton in December 2022 was sustained without leave to amend in late January 2023. 4-S Ranch later consented to Sandton's filing of another demurrer, which attacked the remaining causes of action in the second amended cross-complaint, and a related motion to strike. The latter demurrer was sustained without leave to amend in March 2023. The motion to strike was denied as moot in the same ruling. Additional information is provided in the Discussion, *post*.

### Entry of Judgment / Notice of Appeal

On June 30, 2023, following multiple unsuccessful attempts to obtain the entry of a judgment from which to take an appeal, 4-S Ranch filed a premature notice of appeal regarding the rulings on Sandton's motion for summary adjudication and demurrers to the second amended cross-complaint. Approximately three months later, on September 21, 2023, the trial court issued a judgment in favor of Sandton and against 4-S Ranch on Sandton's complaint and with regard to 4-S Ranch's second amended cross-complaint. We hereby grant 4-S Ranch's unopposed request for its notice of appeal to be treated as having been filed immediately after the entry of judgment. (Cal. Rules of Court, rule 8.104(d)(2).)

14.

**DISCUSSION**

## I.        Summary Adjudication Ruling

### A.        Standard of Review

"Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo." (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210.)  When there are no material factual disagreements, the appellate court considers only the dispositive legal issues. (*Bradsbery v. Vicar Operating*, *Inc.* (2025) 110 Cal.App.5th 899, 907; see *Drouet v. Superior Court* (2003) 31 Cal.4th 583, 589.)  "The trial court's stated reasons for granting summary judgment are not binding on us because we review its ruling, not its rationale." (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)  "Although we conduct a de novo review, we 'must presume the judgment is correct, and the appellant bears the burden of demonstrating error.'" (*Tubbs v. Berkowitz* (2020) 47 Cal.App.5th 548, 554.)

### B.        General Overview

Real property financing typically involves a security instrument that enables the lender to reach assets of the borrower if the loan is not repaid. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1235.)  "'In California, the security instrument is most commonly a deed of trust (with the debtor and creditor known as trustor and beneficiary and a neutral third party known as trustee).'" (*Ibid.*)  "In a nonjudicial foreclosure, also known as a 'trustee's sale,' the trustee exercises the power of sale given by the deed of trust." (*Id.* at p. 1236.)

The term "appurtenance," which basically means something that is attached to something else, "has long been used in reference to land and easements." (*Abatti v. Imperial Irrigation Dist.* (2020) 52 Cal.App.5th 236, 255.)  When water is said to be "appurtenant" to land, it means "the water right or interest is attached to land." (*Ibid.*)  As a general rule, "'rights and appurtenances that ordinarily pass with a conveyance of land pass to a purchaser on foreclosure.'" (*Nicoll v. Rudnick* (2008) 160 Cal.App.4th

15.

550, 559.)  Therefore, "because water rights are considered appurtenant to the land, they are presumed transferred with the land absent an express reservation."  (*Id*. at pp. 559–560.)

A loan secured by both real property and personal property is sometimes described as having "mixed collateral."  (See, e.g., *Aspen Enterprises*, *Inc. v. Bodge* (1995) 37 Cal.App.4th 1811, 1817–1818.)  The sale of mixed collateral in a single nonjudicial foreclosure is known as a "unified sale."  (*Florio v. Lau* (1998) 68 Cal.App.4th 637, 642; e.g., *PV Little Italy*, *LLC v. MetroWork Condominium Assn.* (2012) 210 Cal.App.4th 132, 162.)  Unified sales are neither mandatory nor permitted in all instances of default on a loan secured by mixed collateral.  The unified sale option "can be chosen only when the real and personal property are closely enough related that selling them as a unit is a commercially reasonable choice."  (*Florio*, *supra*, at p. 642.)

As discussed, 4-S Ranch (the trustor) executed a deed of trust in favor of Sandton Credit (the beneficiary) against the Land.  The deed of trust included all "Water Rights" as part of the collateral.  The parties agree the nonjudicial foreclosure in this case was not a unified sale, i.e., there was no sale of any personal property against which Sandton Credit's loan may have been secured.  It is also undisputed there was no express reservation of any water rights in the trustee's deed of sale conveying the Land to Sandton Credit following its purchase by means of a credit bid.  As such, the only way 4-S Ranch can establish a right to, or interest in, the so-called "stored water" is by showing the water was its personal property.

Sandton argues the trial court correctly determined that the water and all rights thereto were appurtenant to the Land.  4-S Ranch insists the water was its personal property and remains its personal property because there was no unified sale in the foreclosure proceedings.  Because we conclude the personal property argument is meritless, we need not address the trial court's alternative reasons for granting the summary adjudication motion.  The opening brief contains an argument regarding certain

16.

language in the parties' contractual definition of "Water Rights," but the claim is dependent upon the merits of 4-S Ranch's personal property contentions and therefore does not warrant a separate discussion.

The opening brief contains passing references to certain affirmative defenses pleaded in the answer to Sandton's complaint, but 4-S Ranch makes no effort to argue the merits of those defenses. We deem all such issues forfeited. (See *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52; *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1.) "We are not required to examine undeveloped claims or to supply arguments for the litigants." (*Allen*, at p. 52; see *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 ["Although our review of a summary judgment is de novo, it is limited to issues which have been adequately raised and supported in [the opening] brief"].)

### C.  Relevant Principles and Legal Authority

"It is a fundamental principle of water law that one may not withdraw water from its source without first acquiring 'water rights.' [Citations.] Conceptually, what is meant by a water right is the right to *use* the water—to divert it from its natural course." (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 100.) "'Hence, the cases do not speak of the ownership of water, but only of the right to its use.'" (*Ibid.*; accord, *National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 441.) "[W]ater in its natural state cannot be owned by any private person." (*Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 403.)

Our state has a "hybrid system of water rights" based on the doctrines of riparian rights and appropriation rights. (*United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at p. 101.) "Riparian" generally means on or adjacent to a river, stream, or similar source of water. (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1996) 42 Cal.App.4th 608, 618; 62 Cal.Jur.3d (2021) Water, § 67, p. 132.) "The riparian doctrine, a legacy of the English common law, 'confers upon the

owner of land the right to divert the water flowing by his land for use upon his land, without regard to the extent of such use or priority in time.'" (*Santa Barbara Channelkeeper v. City of San Buenaventura* (2018) 19 Cal.App.5th 1176, 1183 (*Santa Barbara Channelkeeper*).)

"Upon discovery of gold and the development of the California mining industry, water was often diverted from streams passing through government lands to be used on nonriparian lands.  To accommodate this usage, the doctrine of *appropriation* originated and was incorporated in California water law.  [Citation.]  The appropriation doctrine confers upon one who actually diverts and uses water the right to do so provided that the water is used for reasonable and beneficial uses and is surplus to that used by riparians or earlier appropriators.  Appropriators need not own land contiguous to the watercourse, but appropriation rights are subordinate to riparian rights …." (*United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at p. 101.)  Since the enactment of the Water Commission Act in 1913 (predecessor to the current Water Code), new appropriative rights must be obtained through a permit or license issued by the State Water Resources Control Board.  (*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1478 & fn. 7; *Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, 753–754.)

"Similar principles govern rights to water in an underground basin."  (*Santa Barbara Channelkeeper*, *supra*, 19 Cal.App.5th at p. 1184.)  For our purposes, as explained in footnote 5, *ante*, the terms "basin" and "aquifer" may be used interchangeably.  "First priority [generally] goes to the landowner whose property overlies the groundwater.  These 'overlying rights' are analogous to riparian rights in that they are based on ownership of adjoining land, and they confer priority."  (*Santa Barbara Channelkeeper*, at p. 1184; see *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1237, fn. 7 ["Overlying rights are special rights to use groundwater under the owner's property"]; *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 301–

18.

302 [different priorities of rights may apply to underground water that is not "native groundwater"].) "Surplus groundwater also may be taken by an appropriator, and priority among 'appropriative rights' holders generally follows the familiar principle that '"the one first in time is the first in right."'"[7] (*Santa Barbara Channelkeeper*, at p. 1184.)

Riparian, overlying, and appropriative rights are all "'usufructuary only and confer no right of private ownership'" in the water itself. (*Nicoll v. Rudnick*, *supra*, 160 Cal.App.4th at p. 556, quoting *People v. Shirokow* (1980) 26 Cal.3d 301, 307; accord, *City of Barstow v. Mojave Water Agency*, *supra*, 23 Cal.4th at p. 1237, fn. 7 ["Both riparian and overlying water rights are usufructuary only"].) "A usufructuary water right is the right to take water from the water source" for reasonable and beneficial uses. (*City of Santa Maria v. Adam*, *supra*, 211 Cal.App.4th at p. 301; see *Light v. State Water Resources Control Bd.*, *supra*, 226 Cal.App.4th at p. 1479.) To the extent the holder of water rights has a possessory interest in water, the interest does not necessarily constitute a personal property right. (See *Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1271, fn. 5 ["Water rights carry no specific property right in the corpus of the water itself"]; *Central and West Basin Water Replenishment Dist. v. Southern Cal. Water Co.* (2003) 109 Cal.App.4th 891, 905 ["Water rights holders have the right to 'take and use water,' but they do not own the water and cannot waste it"].)

California water rights have been classified as an interest in real property since the earliest published decisions on the subject. As stated in *Hill v. Newman* (1855) 5 Cal.

---

[7]"With groundwater there is an exception, however, that gives rise to a third category of rights. Under certain circumstances, an appropriator may gain 'prescriptive rights' by using groundwater to which it is not legally entitled in a manner that is '"actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right."'" (*Santa Barbara Channelkeeper*, *supra*, 19 Cal.App.5th at p. 1184.) The concept of prescription is closely analogous to the doctrine of adverse possession. (See *Hansen v. Sandridge Partners*, *L.P.* (2018) 22 Cal.App.5th 1020, 1032; 1 Slater, California Water Law and Policy, *supra*, ch. 4, pp. 4-4 to 4-11.) There are no prescription issues in this appeal, but the principle is noted here because the main case relied upon by 4-S Ranch, *Dannenbrink v. Burger*, *supra*, 23 Cal.App. 587, involved a dispute over prescriptive water rights.

445, "The right to water must be treated in this State as it has always been treated, as a right running with the land, and as a corporeal privilege bestowed upon the occupier or appropriator of the soil; and as such, has none of the characteristics of mere personalty." (*Id*. at p. 446.) Modern case law is in accord. (E.g., *City of Barstow v. Mojave Water Agency*, *supra*, 23 Cal.4th at p. 1240 ["An overlying right '… is based on the ownership of the land and is appurtenant thereto'"]; *Abatti v. Imperial Irrigation Dist.*, *supra*, 52 Cal.App.5th at p. 255 ["'Although there is no private property right in the corpus of the water …, the right to its use is classified as real property.' … Appropriative water rights are ordinarily appurtenant to the land"]; *Nicoll v. Rudnick*, *supra*, 160 Cal.App.4th at p. 558 [same].)

California's requirement of severance from the land as a prerequisite to water being treated as personal property also dates back to the 19th century. (E.g., *People ex rel. Heyneman v. Blake* (1862) 19 Cal. 579, 594 (*Blake*) ["Water, when collected in reservoirs or pipes, and thus separated from the original source of supply, is personal property, and is as much the subject of sale … as ordinary goods and merchandise"].) The cases from that era generally concluded the confinement of water in artificial (human-made) enclosures was sufficient. (See *ibid.; Parks Canal and M. Co. v. Hoyt* (1880) 57 Cal. 44, 46 ["The appropriator certainly does not become the owner of the very body of the water until he has acquired control of it in conduits or reservoirs, created by art, or applied to the purpose of leading or storing water by artificial means"]; but see *Fudickar v. East Riverside I. Dist.* (1895) 109 Cal. 29, 36.) The California Supreme Court later disapproved of that view and clarified the requirement of severance in *Stanislaus Water Co. v. Bachman*, *supra*, 152 Cal. 716 and *Copeland v. Fairview Land etc. Co.* (1913) 165 Cal. 148.

The *Bachman* case states that "water in its natural situation upon the surface of the earth, whether as a flowing stream, as a lake or pond, or as percolations in the soil, is real property …. [I]t may become personalty by being severed from the land and confined in

20.

portable receptacles." (*Stanislaus Water Co. v. Bachman*, *supra*, 152 Cal. at p. 725.) The opinion goes on to explain:

> "The business of collecting water in reservoirs, conducting it in pipes to houses of a city, and there selling and delivering it to the occupants of such houses is a process of severing the water from its connection with the earth and changing it into personal property. The person or corporation engaged therein is as much engaged in trade and commerce as is the miner, the oil producer, the brick maker, or the cement manufacturer who sells his product. But the substances in which these persons deal do not become personalty until the severance is complete. *The right to the water in the pipes and the pipes themselves usually constitute an appurtenance to real property in such cases*, *and*, *if so*, *the water usually retains its character as realty until severance is completed by its delivery from the pipes to the consumer*." (*Id*. at p. 726, italics added.)

Five years later, in *Copeland*, a party relied on the decades-old *Blake* opinion to argue that because its water supply was "stored in a reservoir, such stored water [was] personal property which cannot be appurtenant to land." (*Copeland v. Fairview Land etc. Co.*, *supra*, 165 Cal. at pp. 153–154.) The high court rejected the argument, disapproved of the language in *Blake*, and reiterated the view expressed in *Bachman*:

> "There is a statement in [*Blake*, *supra*, 19 Cal. at page 594] … that water, when collected in reservoirs and pipes and thus separated from its original source, is personal property. But this declaration cannot be accepted as sound. The question involved in that case was the question whether or not a corporation which stores water, conducts it through the earth in pipes and sells and delivers it by that means to the inhabitants of a city on their premises, is engaged in trade and commerce. Unquestionably it is, but not, as is there erroneously said, because the water becomes personalty when thus stored, but, as is further said, because it is then sold for a price to the inhabitants. Upon delivery for household use, it undoubtedly becomes personal property, being then completely severed from the realty. The question of the character of water as property was fully considered in *Stanislaus etc. Co. v. Bachman*, [*supra*,] 152 Cal. [at page] 725. *[Blake]* was distinguished, and the remark therein, above referred to, was declared not to be the law." (*Copeland*, *supra*, at p. 154.)

The *Copeland* opinion further states that "[w]ater, in its natural state, whether in streams, lakes or ponds, or in percolation through the soil, is part of the land. Like any

21.

other part thereof, it may become personal property by being severed from the realty, *but not until then*." (*Copeland v. Fairview Land etc. Co.*, *supra*, 165 Cal. at p. 154, italics added.) "When it is sold for domestic use and delivered by means of pipes to the premises in the usual manner, the pipes themselves are fixtures and part of the realty, and this severance takes place when the water is taken from the pipes by the consumer." (*Ibid.*)

In *Lewis v. Scazighini* (1933) 130 Cal.App. 722, the respondent contractually agreed to pay commissions to the appellants for "water sold from wells on respondent's ranch." (*Ibid.*) The issue on appeal was whether the water sold to a third-party buyer was real or personal property. The distinction mattered because the trial court had sustained a demurrer "on the theory that the contract called for the sale by appellants of an interest in real property and that appellants were not alleged to be licensed real estate brokers." (*Id*. at p. 723.) Applying the principles articulated in *Copeland* and *Bachman*, the appellate court held that "[w]hen the water was delivered to the [buyer] for use in its drilling operations it became severed from the real property on which it was produced and became personalty." (*Id*. at p. 724, citing *Copeland v. Fairview Land etc. Co*., *supra*, 165 Cal. at p. 154 & *Stanislaus Water Co. v. Bachman*, *supra*, 152 Cal. at p. 725.)

Modern case law continues to require complete severance from the land for any recognition of personal property rights in water. The following examples are representative of the prevailing view. "[T]here is no ownership of water, gas, or oil on the land other than in usufruct. [Citations.] Water in its natural state is categorized as a type of real property until severed from the realty 'and confined in portable receptacles,' at which point the water transmutes to personal property." (*People v. Davis* (2016) 3 Cal.App.5th 708, 715, quoting *Stanislaus Water Co. v. Bachman*, *supra*, 152 Cal. at p. 725; accord, *Santa Clarita Water Co. v. Lyons* (1984) 161 Cal.App.3d 450, 461.) "[T]here obviously remains a sense in which discrete quantities of water can be 'owned.' For example, one who purchases a container of Arrowhead Puritas water then 'owns' five

gallons of California water. [Citation.] But in its natural state, water is certainly not subject to ownership by an individual." (*State of California v. Superior Court*, *supra*, 78 Cal.App.4th at p. 1025.)

4-S Ranch fails to acknowledge any case law on the requirement of severance in its opening brief. In the reply brief, it concedes *Stanislaus Water Co. v. Bachman*, *supra*, 152 Cal. 716 says "water in its natural situation upon the surface [is real property]" but does not provide the full quote. It then argues the principle is irrelevant because the present case involves floodwater and floodwater is "not naturally *occurring*." (Italics added.) A few paragraphs later, following a page break, 4-S Ranch contends *Bachman* "expressed that naturally occurring waters must be contained in a portable manner for the water to become personal property." The semantic sleight of hand fails.

Floodwater has long been defined as the "'extraordinary overflow of rivers and streams.'" (*Locklin v. City of Lafayette*, *supra*, 7 Cal.4th at p. 345; e.g., *Keys v. Romley* (1966) 64 Cal.2d 396, 400; *Contra Costa County v. Pinole Point Properties, LLC* (2015) 235 Cal.App.4th 914, 928; *Martinson v. Hughey* (1988) 199 Cal.App.3d 318, 325.) While floods may not ordinarily occur, whether floodwater is an "abnormally occurring" class of water (a phrase used in 4-Ranch's briefs) is irrelevant. "[W]ater in its *natural situation* upon the surface of the earth, whether as a flowing stream, as a lake or pond, or as percolations in the soil, is real property." (*Stanislaus Water Co. v. Bachman*, *supra*, 152 Cal. at p. 725, italics added.) As used in *Bachman*, the phrase "in its natural situation" (*ibid.*) is another way of saying "in its natural state." (*Copeland v. Fairview Land etc. Co.*, *supra*, 165 Cal. at p. 154; *State of California v. Superior Court*, *supra*, 78 Cal.App.4th at p. 1025.)

4-S Ranch provides no authority or persuasive argument for the proposition that floodwater is not a form of water in its natural state. It does not even attempt to explain how such water would not be in a natural state after seeping and percolating into a natural underground aquifer. California law recognizes real property rights in various forms of

groundwater, including overlying rights to water in aquifers. (*Antelope Valley Groundwater Cases* (2021) 62 Cal.App.5th 992, 1022–1023.) "As with water generally in its situation in watercourses on the surface of the earth, percolating water in the soil is real property, part and parcel of the land." (62 Cal.Jur.3d, *supra*, Water, § 379, p. 508.)

### *The Dannenbrink Case*

In the introduction to its opening brief, 4-S Ranch makes this contention: "California law states that when a landowner takes floodwaters, those waters become personal property of the landowner and can be routinely transferred, subject only to applicable law or regulation." Twelve pages later, it is revealed 4-S Ranch's only authority for that proposition is *Dannenbrink v. Burger*, *supra*, 23 Cal.App. 587 (*Dannenbrink*). This is an immediate red flag. It only takes reading the (admittedly dense) opinion to discover the *Dannenbrink* case did not involve floodwater. Nor did it involve water entering upon someone's land. Nor did it involve any transfers of water.

The *Dannenbrink* plaintiffs were miners with ownership interests in two relevant "ditches" used to divert water from a mountain stream ("Gwin gulch"). (*Dannenbrink*, *supra*, 23 Cal.App. at pp. 588–589.) The quantity of water in Gwin gulch "varie[d] according to the seasons of the year. In the winter time or the rainy season the flow of water in the gulch [was] large, while in the summer months [and months with little or no rain], the flow of water naturally decrease[d] so that the stream [contained or carried] a very small amount of water." (*Id*. at p. 589.)

The *Dannenbrink* plaintiffs had appropriative rights to take and use 1,200 inches of water from Gwin gulch.[8] The *Dannenbrink* defendants also owned ditches that were used to divert water from the same mountain stream, i.e., Gwin gulch, but their ditches

---

[8]"Water used by the pioneer miners was measured by the miner's inch …. The miner's inch of the early miner was the quantity of water that would flow through an orifice one inch square, measured under a head varying from four to 12 inches, depending on the geographical locality." (62 Cal.Jur.3d, *supra*, Water, § 2, p. 36, fn. omitted.) As used in the *Dannenbrink* opinion, the term "inches of water" refers to the volume of water diverted from the stream as "measured under a four-inch pressure." (*Dannenbrink*, *supra*, 23 Cal.App. at p. 591.)

were located approximately 960 feet and 1,500 feet downstream from the plaintiffs' ditches (a distance of roughly three to five football fields). (*Dannenbrink*, *supra*, 23 Cal.App. at pp. 589–590.)

For many years, a dam ("which was built in part of logs and loosely constructed") and flume associated with one of the plaintiffs' ditches "were in such condition as that a small proportion of the water taken into said ditch from Gwin gulch percolated or seeped through said flume and through and under said dam and again found its way to the channel of the gulch." (*Dannenbrink*, *supra*, 23 Cal.App. at p. 592.) In other words, the "small proportion of water" returned to the same mountain stream from which it had originated, then proceeded to flow downstream to the defendants' ditches. The circumstance of the water escaping from artificial structures and returning to the same stream, rather than flowing to some other stream or location, was the key fact upon which the case was decided.

The downstream defendants "had appropriated and continuously used for their purposes for a period of about twenty-five years" the water that escaped from the plaintiffs' ditch. (*Dannenbrink*, *supra*, 23 Cal.App. at p. 592.) The plaintiffs eventually "removed the flume, tightened the ditch so that it would no longer admit of the loss by seepage of any of the waters taken into it, and installed a new dam, impermeable or watertight, in the place of the old dam …. These changes in the dam and ditch resulted, of course, in preventing water from said ditch returning, in any perceptible degree, to the gulch, and thus causing the defendants to be deprived of sufficient water from said stream to supply their needs." (*Ibid*.) The defendants alleged an entitlement to the "seventy-two inches of water" they had come to rely upon. (*Id*. at p. 590.) This led to the plaintiffs filing "a suit to quiet title to certain water-rights and to enjoin the defendants from claiming or asserting any claim to said water-rights." (*Id*. at p. 588.)

The *Dannenbrink* defendants prevailed in the trial court. Although the plaintiffs had superior appropriative rights, the defendants were found to have acquired a

prescriptive right to continue receiving the same amount of water previously available to them and appropriated by them in the many years prior to the plaintiffs' renovation of the leaky ditch. (*Dannenbrink*, *supra*, 23 Cal.App. at pp. 590–591, 593.) The plaintiffs appealed, arguing the issue was "'[w]hether or not a prior appropriator has, at any time, the right to tighten his dam, flumes and ditch so that there shall be no leakage therefrom.'" (*Id*. at p. 593.) The appellate court rejected that premise, declaring the "question presented for solution" to be whether an appropriator with superior rights "may so change or reconstruct his ditch, flumes, and dam as to prevent waters seeping through his ditch from discharging *into the original stream from which they were thus taken*, after such discharge of such waters has continued uninterruptedly for a period of time sufficient to establish a prescriptive title thereto in one who had actually appropriated and continuously used such seepage waters during all of such period of time." (*Id*. at pp. 593–594, italics added.)

After framing the issue, the appellate court explained why the trial court had correctly ruled in favor of the defendants. (*Dannenbrink*, *supra*, 23 Cal.App. at pp. 594–595.) The finer points of the analysis are not relevant here. It suffices to say, as earlier indicated, the outcome turned on "the distinction which is recognized between the case of the discharge of seeping water from an artificial watercourse into a place other than the stream from which it is diverted and the case of the return of such water to the stream itself from which the original diversion is made." (*Id*. at p. 597.)

In the final pages of the opinion, the *Dannenbrink* court explained why the cases relied on by the plaintiffs were distinguishable. Those cases were not identified, but they were said to reflect the "well settled" principle "that where water escaping or leaking from an artificial watercourse goes to waste by flowing promiscuously over *other* lands or finds its way to some *other* stream than the one from which it is diverted into such artificial watercourse, a person appropriating such water thus merely takes the corpus and not the usufruct therein." (*Dannenbrink*, *supra*, 23 Cal.App. at p. 596, italics added.) In

that scenario, the appropriator cannot acquire prescriptive rights and the "owner of such ditch or artificial watercourse is at liberty at any time to change or alter it without invading any vested right of the appropriator." (*Ibid.*)

Next, after citing California precedent on a related principle, the appellate court resumed discussion of the distinguishing factual circumstances and quoted language "by Baron Parke, in *Arkwright v. Gell*, 5 Mees. & W. 226." (*Dannenbrink*, *supra*, 23 Cal.App. at p. 596.) The reference to Baron Parke and citation to the "Mees. & W." (Meeson & Welsby) reporter indicates the *Arkwright* case was decided in England circa the mid-1800's.[9] The *Arkwright* quote was as follows:

> "'[T]he lower claimant who received and put to use [water pumped from a mine and run off in a ditch] would only have a right to use it, for any purpose to which it was applicable, so long as it continued there. Time would raise no presumption of a grant nor found any claim to a continuance of the discharge; for the mine owner could not bring any action against the person using the water, so as to make him stop using it; and consequently such use did not in any way concern or bind the mine owner. We, therefore, think that the plaintiffs never acquired any right to have the stream of water continued in its former channel.'" (*Dannenbrink*, at pp. 596–597.)

Immediately following the above quote, the *Dannenbrink* court attempted to paraphrase it by stating, "In other words, the appropriator merely secures the corpus of the water thus escaping as personalty, but does not thereby secure or acquire the right to the continuous flow of such water." (*Dannenbrink*, *supra*, 23 Cal.App. at p. 597.) It is the latter quote, and specifically the word "personalty," that 4-S Ranch relies upon to argue floodwater becomes the personal property of anyone who exercises dominion and control over it.

---

[9]See *Grobart v. Society for Establishing Useful Manufactures* (N.J. 1949) 2 N.J. 136, 151; Fidell, *The Culture of Change in Military Law* (1989) 126 Mil. L.Rev. 125, 128 (describing Baron Parke as an esteemed judge "who served on the Court of King's Bench and Court of Exchequer for many years" before retiring in 1855).

First, the statement was dictum. Second, the dictum and discussion in which it appeared had nothing to do with floodwater. The *Dannenbrink* court was obviously not addressing or deciding any issue even close to the one presented in this appeal. The California Supreme Court had already decided, five years earlier, *Stanislaus Water Co. v. Bachman*, *supra*, 152 Cal. 716. The high court's decision in *Copeland v. Fairview Land etc. Co.*, *supra*, 165 Cal. 148 was decided only nine months before *Dannenbrink*. Asserting a position squarely at odds with *Bachman* and *Copeland* would have violated the doctrine of stare decisis. Furthermore, the dictum is not necessarily in tension with *Bachman* or *Copeland* because there was no discussion of the severance requirement. "'It is axiomatic, of course, that a decision does not stand for a proposition not considered by the court.'" (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 332.)

All of this to say, the *Dannenbrink* opinion has no precedential or persuasive value relative to the issues in this appeal. To be blunt, the case is irrelevant. It does not concern ownership of water in any form, but rather the circumstances in which an appropriator may acquire a prescriptive right to the continued availability of water from a particular source.

### D.     4-S Ranch's Additional Authorities

The case of *Gallatin v. Corning Irr. Co.* (1912) 163 Cal. 405 is initially cited by 4-S Ranch for the proposition "that floodwaters may be taken [for] personal use." This is generally correct. (See *Gallatin*, at p. 413.) But "personal use"—which is appellant's phrase and not one used in *Gallatin*—does not mean ownership as personal property. 4-S Ranch also relies on *Gallatin* in several "cf." citations to argue floodwater becomes the personal property of anyone who exercises "control" over it. The *Gallatin* case is not supportive of that contention.

Next is *Mogle v. Moore*, *supra*, 16 Cal.2d 1. In its opening brief, 4-S Ranch cites *Mogle* in support of the following statement: "Landowners may not obstruct surface waters or natural watercourses, but they may control or obstruct floodwaters." This is

28.

correct, but *Mogle* does not address the "control" of floodwater in the way 4-S Ranch implies. The opinion explains that while landowners are prohibited from obstructing """"the flow on to his land of what are technically known as surface waters,""" a landowner does have "the right to protect himself against flood waters, … and for that purpose to obstruct their flow on to his land, and this even though such obstruction causes the water to flow on to the land of another." (*Mogle*, at p. 10.)

In the reply brief, 4-S Ranch cites to *Mogle* while arguing that "[f]loodwaters can be owned and controlled." The argument is unsupported by *Mogle* with respect to the ownership of floodwater. The *Mogle* defendants were sued for preventing floodwater from entering their land, doing so by means of obstruction and diversion, which resulted in the water being redirected to the plaintiffs' land and causing damage. (*Mogle v. Moore*, *supra*, 16 Cal.2d at pp. 4–6, 11.) There was no issue or analysis regarding the character of floodwater as real versus personal property when it enters upon a person's land, nor any discussion regarding ownership of floodwater.

The reply brief also includes a citation to *City of Santa Maria v. Adam*, *supra*, 211 Cal.App.4th 266. The case is cited as support for the contention that "floodwaters are subject to ownership." If anything, *Adam* refutes the contention.

4-S Ranch cites to part of the *Adam* opinion addressing the priority of rights in underground water that is not "native groundwater." (*City of Santa Maria v. Adam*, *supra*, 211 Cal.App.4th at pp. 301, 304–305.) Native groundwater originates from "rainfall, natural infiltration from lakes and streams, and other natural inflows." (*Id*. at p. 280.) A landowner's overlying rights to native groundwater are generally superior to those of anyone else. The landowner's rights may be inferior, however, with respect to subsurface water "made available by the efforts of another." (*Id*. at p. 304.) The *Adam* opinion does not, however, equate priority of rights to various forms of groundwater with personal property ownership. In a separate discussion, it is explained that while the appropriation of water results in a possessory right that is no longer usufructuary, "the

29.

appropriator does not own the water in the sense of having title to the individual water molecules." (*Id.* at p. 302.)

### E. Analysis and Conclusion

The opening sentence of the reply brief states: "At its core, this case is about the character of floodwater." For the reasons discussed above, the notion of floodwater having a special status in the context of distinguishing between realty and personal property is not correct. The appellate briefs do not demonstrate otherwise.

4-S Ranch also emphasizes its alleged control of the subject water during its ownership of the Land, including vague statements about the "floodwater" having been "captured" and "diverted." In the summary adjudication ruling, the trial court concluded 4-S Ranch "never exercised dominion and control over the water it now asserts to be personal property during its period of ownership." There was certainly no evidence of 4-S Ranch doing anything more than passively allowing water to "inundate" the Land pursuant to the easement agreements with the government. In any event, there is no dispute that the subject water ultimately reached the aquifer by natural processes of seepage and percolation.

Sandton is willing to assume 4-S Ranch may have in some way "facilitated" the process by which the water came to be in the aquifer, but they argue such facts would be immaterial. We agree. No authority has been provided, nor are we aware of any, that would suggest merely exercising control over water (be it floodwater or otherwise) is sufficient to create a personal property interest therein.

All appropriation and use of water involves some degree of control. "The entire history of the origin and development of the doctrine of appropriation of water in California, existing alongside the ancient common law concept of riparian rights, demonstrates that appropriation of water in the legal sense involves possession of the water, evidence[d] by some form of diversion or physical control over it. The courts from the very birth of the legal concept of appropriation of water have uniformly

30.

evidenced the basic common element of possession.  Sometimes it is referred to as a 'taking' of water, 'diversion,' or a 'physical control.'" (*California Trout, Inc. v. State Water Resources Control Bd.* (1979) 90 Cal.App.3d 816, 819; accord, *Fullerton v. State Water Resources Control Bd.* (1979) 90 Cal.App.3d 590, 599, fn. 8.)  However, "the appropriator does not own the water in the sense of having title to the individual water molecules." (*City of Santa Maria v. Adam*, *supra*, 211 Cal.App.4th at p. 302.)  To hold that merely exercising "dominion and control" over water is sufficient to establish a personal property right would be contrary to the fundamental principles of California's water laws.  (See Cal Const., art. X, § 2; Wat. Code, § 102.)

The trial court's determination regarding the legal classification of the water at issue is backed by substantial precedent.  4-S Ranch fails to demonstrate otherwise and has not established any grounds for reversal.  We therefore conclude the motion for summary adjudication was properly granted.

## II.     Demurrer Rulings[*]

We now turn to the dismissal of 4-S Ranch's second amended cross-complaint against Sandton.  The cross-action was primarily aimed at setting aside the trustee's sale of the Land.  4-S Ranch attempted to plead several closely related claims of wrongful foreclosure, all which were held to be nonviable.

### A.     Standard of Review

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.)  The complaint is liberally construed, with "'all material facts properly pleaded'" accepted as true, but no weight is given to "'contentions, deductions or conclusions of fact or law'" therein. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  "If the allegations in the

---

[*]See footnote, *ante*, page 1.

31.

complaint conflict with the exhibits, we rely on and accept as true the contents of the exhibits." (*SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 83.)

"Where the demurrer was sustained without leave to amend, we consider whether the plaintiff could cure the defect by an amendment.  The plaintiff bears the burden of proving an amendment could cure the defect." (*T.H. v. Novartis Pharmaceuticals Corp.*, *supra*, 4 Cal.5th at p. 162.)  "[U]nless failure to grant leave to amend was an abuse of discretion, the appellate court must affirm the judgment if it is correct on any theory." (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742.)

## B.    Legal Overview

"Civil Code sections 2924 through 2924k … govern nonjudicial foreclosure sales pursuant to a power of sale contained in a deed of trust." (*Biancalana v. T.D. Service Co.* (2013) 56 Cal.4th 807, 813.)  "The statutory scheme can be briefly summarized as follows.  Upon default by the trustor, the beneficiary may declare a default and proceed with a nonjudicial foreclosure sale.  [Citations.]  The foreclosure process is commenced by the recording of a notice of default and election to sell by the trustee.  [Citations]." (*Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830.)  "The manner in which the sale must be conducted is governed by [Civil Code] section 2924g," which includes a requirement that the property be sold at a public auction to the highest bidder.  (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 87.)

"Nonjudicial foreclosure is less expensive and more quickly concluded than judicial foreclosure, since there is no oversight by a court, '[n]either appraisal nor judicial determination of fair value is required,' and the debtor has no postsale right of redemption.  [Citation.]  However, the creditor may not seek a deficiency judgment." (*Alliance Mortgage Co. v. Rothwell*, *supra*, 10 Cal.4th at p. 1236.)  "[I]f the lender chooses to bid, it does so in the capacity of a purchaser.  [Citation.]  The only distinction between the lender and any other bidder is that the lender is not required to pay cash, but

is entitled to make a credit bid up to the amount of the outstanding indebtedness." (*Id*. at p. 1238.)

"A properly conducted nonjudicial foreclosure sale constitutes a final adjudication of the rights of the borrower and lender." (*Moeller v. Lien*, *supra*, 25 Cal.App.4th at p. 831.) "'If the trustee's deed recites that all statutory notice requirements and procedures required by law for the conduct of the foreclosure have been satisfied, a rebuttable presumption arises that the sale has been conducted regularly and properly.'" (*Biancalana v. T.D. Service Co.*, *supra*, 56 Cal.4th at p. 814.) "This presumption may only be rebutted by substantial evidence of prejudicial procedural irregularity." (*Melendrez v. D & I Investment*, *Inc.* (2005) 127 Cal.App.4th 1238, 1258.)

A legal action to set aside a trustee's sale is a suit in equity. (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 103.) "Because the action is in equity, a defaulted borrower … is required to do equity before the court will exercise its equitable powers. [Citation.] Consequently, as a condition precedent to an action [brought] on the ground that the sale is voidable because of irregularities in the sale notice or procedure, the borrower must offer to pay the full amount of the debt for which the property was security." (*Id*. at p. 112.) This requirement is commonly known as the "tender rule."

### C. Additional Background

The seven causes of action in the operative cross-complaint were labeled as follows: (1) "To Set Aside Sale"; (2) "Declaratory Relief"; (3) "To Cancel Trustee's Deed"; (4) "Damages for Wrongful Foreclosure"; (5) "Conversion"; (6) "Injunctive Relief"; (7) "Easement." (Boldface omitted.)

The second, fifth, sixth, and seventh causes of action were based on 4-S Ranch's argument that the "stored water" was its personal property before and after the nonjudicial foreclosure sale. The "easement" cause of action, for example, alleged the need for "an easement or irrevocable license to enter [upon the Land] … to drill wells and install pumping equipment, plumbing, electrical, water conveyance and other equipment

33.

and facilities necessary to extract and transfer the [water]." We collectively refer to these causes of action as the personal property claims.

The first, third, and fourth causes of action will be collectively referred to as the wrongful foreclosure claims. These claims were based on allegations Sandton "engaged in conduct before and/or at the trustee's sale designed to suppress bidding at the sale, and thereby purchase [the Land] for an amount far below its actual value." To plead around the presumption of regularity established by the trustee's deed of sale, 4-S Ranch attempted to allege fraud based on these contentions:

> "[Sandton wrongfully asserted the water] was part of its collateral, but instruct[ed] its appraiser [two years prior to the foreclosure sale] not to assign a value to [the water], for the purpose of reducing the value of [its] collateral;"

> "[Sandton intentionally concealed from 4-S Ranch], the bankruptcy court, other creditors, and potential bidders the existence of a second appraisal conducted by [a third party] which valued for storage and resale the water rights and interests of 4-S [Ranch] relating to [the Land] collateral that Sandton instructed its [other appraiser] not to include in the only appraisal provided to 4-S [Ranch] and filed with the bankruptcy court in support of Sandton's relief from stay motion in 4-S [Ranch]' Chapter 11 case. The existence of the [second appraisal] was unknown until produced to 4-S [Ranch] by Sandton in this litigation[;]"

> "4-S [Ranch] is informed and believes that Sandton intentionally misrepresented to potential bidders the nature and value of water stored [on the Land] prior to the foreclosure sale in an effort to obtain that value and resell the property, including water sources, storage capacity and water stored and available for potential resale, in order to obtain a windfall, and further intentionally avoided disclosing the existence of such property and value by instructing the foreclosure trustee not to include personal property interests in the sale, and intentionally concealing from the foreclosure trustee, Cross-Defendant WT Capital, the existence of a UCC-1 filed by Sandton at the time of the loan." (Boldface omitted.)

4-S Ranch claimed to be excused from compliance with the tender rule "due to [Sandton's] wrongful and fraudulent conduct" and the "gross inadequacy" of Sandton's

$20 million credit bid in light of the Land's alleged "actual value" of hundreds of millions of dollars.

In its demurrer to the wrongful foreclosure claims, Sandton argued 4-S Ranch had failed to plead an exception to the tender rule that would excuse its noncompliance. Sandton further argued the fraud allegations were not pleaded with sufficient particularity and detail. In a third argument, Sandton claimed any statements or representations it had made in the bankruptcy proceedings were protected by the litigation privilege of Civil Code section 47.

The trial court agreed with Sandton's arguments. 4-S Ranch's failure to comply with or plead around the tender rule was identified as the primary reason for sustaining the demurrer without leave to amend.

Sandton's demurrer to the personal property claims was based on the "derivative" nature of those claims vis-à-vis what we have called 4-S Ranch's personal property argument. In light of the trial court's summary adjudication ruling, which rejected the personal property argument on the legal merits, Sandton argued the personal property claims were untenable. The trial court agreed, noting 4-S Ranch's opposition to the demurrer was essentially a request for reconsideration of the summary adjudication ruling. The demurrer was therefore sustained without leave to amend.

## D.     Analysis and Conclusion

4-S Ranch concedes its personal property claims were dependent upon its alleged "ownership of the floodwaters as personal property." Because the personal property argument was correctly rejected on the merits in the summary adjudication ruling, we conclude the demurrer was properly sustained as to the personal property claims. There does not appear to be a reasonable possibility of curing the pleading defects by amendment, and no curative amendments are proposed in the briefing. The dismissal of those claims will therefore be affirmed.

35.

As for the wrongful foreclosure claims, the essential elements are "(1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale suffered prejudice or harm; and (3) the trustor or mortgagor tender[ed] the amount of the secured indebtedness or was excused from tendering." (*West v. JPMorgan Chase Bank*, *N.A.* (2013) 214 Cal.App.4th 780, 800.)  The third of these elements is the tender rule. (*Turner v. Seterus*, *Inc.* (2018) 27 Cal.App.5th 516, 525.)

"A valid and viable tender of payment of the indebtedness owing is *essential* to an action to cancel a voidable sale under a deed of trust." (*Karlsen v. American Sav. & Loan Assn.* (1971) 15 Cal.App.3d 112, 117, italics added.)  "Where tendering is required and not excused, a plaintiff seeking to set aside an irregular sale must allege tender of the full amount of the loan to maintain *any* cause of action that either is based on the wrongful foreclosure allegations or seeks redress from that foreclosure." (*Turner v. Seterus*, *Inc.*, *supra*, 27 Cal.App.5th at p. 525.)  Failure to plead compliance with the tender rule or facts supporting an exception that would permit noncompliance is grounds for demurrer and dismissal of the action.  (See, e.g., *Kalnoki v. First American Trustee Servicing Solutions*, *LLC* (2017) 8 Cal.App.5th 23, 47–48; *West v. JPMorgan Chase Bank*, N.A., *supra*, 214 Cal.App.4th at p. 802.)

4-S Ranch attempts to conflate the issues of tender and the presumption of regularity in the foreclosure proceedings.  It recycles a meritless argument that was presented below, originally by inserting two case citations into the cross-complaint (*Bank of Seoul & Trust Co. v. Marcione* (1988) 198 Cal.App.3d 113 (*Bank of Seoul*) and *Whitman v. Transtate Title Co.* (1985) 165 Cal.App.3d 312 (*Whitman*)), and purporting to rely on a third case, *Millennium Rock Mortgage*, *Inc. v. T.D. Service Co.* (2009) 179 Cal.App.4th 804 (*Millennium Rock*), in its opposition to the demurrer.  None of those cases involved the tender rule, and they are manifestly distinguishable for other reasons

as well. *Whitman* and *Millennium Rock*, for example, were quiet title actions involving circumstances under which the tender requirement was inapplicable.

In its opening brief, 4-S Ranch incorrectly alleges the trial court "acknowledged the exception to the tender rule expressed in *Whitman* …, *Bank of Seoul* …, and *Millennium Rock*," but concluded 4-S Ranch was "'collaterally estopped from asserting the "gross inadequacy of price" exception to the tender rule' under [those cases]." The contentions are not only inaccurate, but also misquote the trial court in a way that makes the argument misleading. The quote is offered without a record citation.

The trial court ruled 4-S Ranch did *not* allege "a judicially recognized exception to the requirement for tender." It found *Whitman* and *Bank of Seoul* "do not support an exception to the tender requirement," and that *Millennium Rock* likewise "does not support an exception to the tender requirement." The trial court *additionally* found, in light of the summary adjudication ruling in favor of *Sandton*, that 4-S Ranch was "collaterally estopped from asserting the 'gross inadequacy of price' *which served as the basis for the Whitman and Bank of Seoul & Trust Co. Courts' analysis*." (Italics added.) The tender rule is not even mentioned in *Whitman* and *Bank of Seoul*, and the discussions about "gross inadequacy of price" in those cases pertained to other issues. (*Bank of Seoul*, *supra*, 198 Cal.App.3d at p. 119; *Whitman*, *supra*, 165 Cal.App.3d at p. 323.) The trial court did not, as alleged by 4-S Ranch's misquotation, acknowledge a "gross inadequacy of price" exception to the tender rule.

The rationale behind the tender rule "'is that if [the borrower] could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to the [borrower].'" (*Ram v. OneWest Bank, FSB* (2015) 234 Cal.App.4th 1, 18, quoting *FPCI RE-HAB 01 v. E & G Investments, Ltd*. (1989) 207 Cal.App.3d 1018, 1022.) Compliance with the rule or excused noncompliance is a prerequisite for maintaining the type of wrongful foreclosure claims asserted in 4-S Ranch's cross-complaint. (*Ram*, at p. 18.) Therefore, if the pleading was defective for

insufficient allegations regarding the tender rule, any disputes over the sufficiency of its allegations to rebut the presumption of regularity in the foreclosure proceedings are moot. (See *Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1109 ["[plaintiffs] are required to allege tender of the amount of [defendants'] secured indebtedness in order to maintain any cause of action for irregularity in the sale procedure"].)

"Case law has recognized four exceptions to the tender requirement in actions to set aside a foreclosure sale:  (1) the borrower attacks the validity of the debt (e.g., based on fraud); (2) the borrower has a counterclaim or setoff sufficient to cover the amount due; (3) it would be inequitable as to a party not liable for the debt; or (4) the trustee's deed is void on its face (e.g., because the trustee lacked power to convey property)." (*Orcilla v. Big Sur, Inc.* (2016) 244 Cal.App.4th 982, 999.)  The operative cross-complaint does not contain any allegations suggesting the applicability of the first, second, or fourth exception.  There is no indication such allegations could be made, nor has 4-S Ranch proposed to make such allegations in a curative amendment.

The third exception is more often (and more accurately) described as applying "where it would be inequitable to impose such a condition on the party challenging the sale." (*Lona v. Citibank, N.A.*, *supra*, 202 Cal.App.4th at p. 113.)  However, the exception is rarely invoked and there are few published cases from which to provide examples.  The most cited case is *Humboldt Sav. Bank v. McCleverty* (1911) 161 Cal. 285, where the California Supreme Court held it would be inequitable to require a widow to tender the full amount of a debt that "was not hers" and for which she was not liable in order to protect her homestead interest in the subject property.  (*Id*. at p. 291.)  More recent cases have applied the exception to debtor plaintiffs in situations where the foreclosure sale would not have occurred but for the creditors' disregard for contractual or statutory prerequisites for the sale.  (E.g., *Fonteno v. Wells Fargo Bank, N.A.* (2014) 228 Cal.App.4th 1358, 1374 [inequitable to require tender "in order to obtain cancellation

of a sale allegedly conducted in disregard of [a] condition precedent and without any legal authority"]; *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 213–214.)

4-S Ranch admits it defaulted on the loan to Sandton Credit, owed the debt to Sandton Credit, and stipulated to the bankruptcy court granting Sandton Credit's motion for relief from stay. There are no allegations Sandton Credit was not fully authorized by law to commence the nonjudicial foreclosure proceedings. 4-S Ranch makes no allegations of any attempt to tender payment prior to or at the time of the trustee's sale, or any time thereafter. There are no allegations 4-S Ranch was financially capable of tendering the full amount of the debt, and the record shows no such allegations could be made. Therefore, 4-S Ranch was going to lose the Land to foreclosure regardless of who purchased the Land at the trustee's sale. 4-S Ranch failed to plead any facts or circumstances showing the routine imposition of the tender requirement would be inequitable. It does not appear the pleading defect could be cured by amendment, nor are amendments proposed by 4-S Ranch. Therefore, the demurrer to the wrongful foreclosure claims was properly sustained without leave to amend.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

PEÑA, Acting P. J.

WE CONCUR:

SNAUFFER, J.

FAIN, J.[†]

---

[†]Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.